THE JERSEY CITY SEWERAGE AUTHORITY, A BODY POLITIC AND CORPORATE, PLAINTIFF-RESPONDENT, v. THE HOUSING AUTHORITY OF THE CITY OF JERSEY CITY, DEFENDANT AND THIRD-PARTY PLAINTIFF-APPELLANT, v. THE CITY OF JERSEY CITY, A MUNICIPAL CORPORATION, THIRD-PARTY DEFENDANT-RESPONDENT.

Argued December 17, 1962—Decided May 6, 1963.

Mr. *Harry Indursky* argued the cause for appellant, The Housing Authority of the City of Jersey City (*Messrs. Levy, Lemken & Margulies,* attorneys; Mr. *Seymour Margulies,* of counsel and on the brief).

Mr. *Francis X. Fahy* argued the cause for respondent, The Jersey City Sewerage Authority.

Mr. *T. James Tumulty,* Assistant Corporation Counsel, argued the cause for respondent, The City of Jersey City (Mr. *Meyer Pesin,* Corporation Counsel of Jersey City, attorney; Mr. *Tumulty,* of counsel and on the brief).

The opinion of the court was delivered by

SCHETTINO, J. Plaintiff, the Jersey City Sewerage Authority (Sewerage), brought an action in the Superior Court, Law Division, Hudson County, against the defendant, the Jersey City Housing Authority (Housing), to recover service charges for treating defendant's sewage. In its answer defendant relied primarily on two lines of defense: (1) that the Local Housing Authorities Law, *N. J. S. A.* 55:14A–1 *et seq.*, exempts the defendant from sewerage charges, and (2) that inasmuch as the City of Jersey City (City) has agreed, by written contract with Housing, to furnish the services referred to without charge, liability, if any, for these charges rests with City. Defendant impleaded City as a third-party defendant in order to obtain indemnification in the event plaintiff prevailed. City denied any obligation to indemnify Housing.

The case was tried on two stipulations of facts. The trial court found for Sewerage and City and against Housing. 70 *N. J. Super.* 576 (*Law Div.* 1961). Defendant appealed, and while the case was pending in the Appellate Division, we certified it on our own motion.

In 1939 City and Housing signed a cooperation agreement relating to specified housing projects to be erected by the latter. Under the agreement Housing was to pay City an annual sum "in lieu of taxes and in lieu of other fees or charges," and in return City was to provide municipal services "of the same character as those furnished for other dwellings and inhabitants of the City." In 1950 these parties executed another cooperation agreement relating to additional housing to be erected. Once again Housing was to make annual payments "in lieu of such taxes and special assessments and in payment for services, improvements and facilities" which, at the date of the contract and thereafter, City furnished "without cost or charge to other dwellings and inhabitants in the City." Both contracts expressly included sewerage service within the examples of municipal services to be rendered. Until 1957

City provided, without charge, sewerage service to all its property owners, including Housing.

By ordinance dated December 20, 1949, City, in response to a mandate of the Interstate Sanitation Commission, dated July 7, 1949, directing City to take steps to construct proper treatment facilities for the sewage it dumped into navigable streams, created the Jersey City Sewerage Authority. In 1954 City entered into an agreement with Sewerage to have the latter *treat and dispose* of all sewage and other wastes originating in Jersey City by means of the Sewerage's "Sewage Disposal System" which it was then about to construct and put into operation. The sewage disposal system was to be complementary to the "Sewer System" then in existence and being maintained by City for the *collection and disposal* of sewage. The agreement called for the connection of City's sewer system and the sewage disposal system, the former delivering and discharging sewage into the latter. It was also agreed that Sewerage would charge a fee for direct or indirect connection with, or for the use of, its disposal system, with the service fee "charged to and collected from any person contracting for such connection or use of the services or from the owner or occupant, or both of them, of any real property which directly or indirectly is or has been connected with the Sewage Disposal System, or from or on which originates or has originated Sewage which directly or indirectly has entered or may enter into such Sewage Disposal System." The sewage disposal system became operative, and as of October 1, 1957, Sewerage billed Housing for treating its sewage pursuant to a rate schedule, based on the amount of water used, adopted the previous month. Housing has refused to pay for the reasons mentioned earlier.

I.

Section 20 of the Local Housing Authorities Law (*N. J. S. A.* 55:14A–20) declares all housing projects of housing

authorities to be public property devoted to an essential public and governmental purpose and exempts such property from

"all taxes and special assessments of the State or any political subdivision thereof * * * provided, however, that in lieu of such taxes, the public body which owns or holds such property may agree to make payments to a political subdivision for the services, improvements or facilities furnished by it for the benefit of a housing project, but in no event shall such payments exceed the amount last levied as the annual tax of such political subdivision upon the property included in said project prior to the time of its acquisition by the aforesaid public body."

Defendant argues that within the context of this statutory provision any sewerage charge would be a "tax" or "special assessment."

The trial court found, and we agree, that the charge for the treatment of sewage by Sewerage to eliminate pollution is not a tax or a special assessment and consequently not within the meaning of *N. J. S. A.* 55:14A–20. This conclusion is well established in most jurisdictions. See, *e. g., Housing Authority v. City of Blytheville,* 228 *Ark.* 736, 739, 310 *S. W. 2d* 222, 223 *(Sup. Ct.* 1958); *Ripperger v. City of Grand Rapids,* 338 *Mich.* 682, 686, 62 *N. W. 2d* 585, 586–87 *(Sup. Ct.* 1954); *Robertson v. Zimmermann,* 268 *N. Y.* 52, 64, 196 *N. E.* 740, 744 *(Ct. App.* 1935); *State ex rel. Gordon v. Taylor,* 149 *Ohio St.* 427, 434, 79 *N. E. 2d* 127, 131 *(Sup. Ct.* 1948); *Tax Review Board v. Weiner,* 11 *Pa. Dist. & Co. R. 2d* 733, 734 *(C. P.* 1957), aff'd 186 *Pa. Super.* 47, 140 *A. 2d* 372, 373 *(Super. Ct.* 1958); *Bexar County v. City of San Antonio,* 352 *S. W. 2d* 905, 908 *(Tex. Civ. App.* 1961); 2 *Antieau, Municipal Corporation Law* § 19.03, at *p.* 634 (1962); 64 *C. J. S. Municipal Corporations* § 1805, at *p.* 273 (1950). Thus, absent other grounds for sustaining Housing's position, the Sewerage Authorities Law, which authorizes such authorities "to charge and collect rents, rates, fees or other charges * * * for direct or indirect connection with, or the use or services of, the sewerage system," *N. J. S. A.* 40:14A–8(a), entitles plaintiff to collect service charges from defendant.

## II.

Defendant's attempt to shift the service charge to City turns upon the construction of the 1939 and 1950 cooperation agreements. The cooperation agreement has been defined as "a contract between a Local Authority and the governing body of the locality, providing for tax exemption, elimination of unsafe and insanitary dwelling units, supplying of public services, and other forms of cooperation by the local government, and for payments in lieu of taxes by the Local Authority, in connection with a low-rent housing project." Housing and Housing Credit, 24 *C. F. R.* § 1520.1 (1962). Such contracts play an integral part within the context of the overall federal scheme for low-rent housing under the United States Housing Act of 1937, as amended. 42 *U. S. C. A.* § 1401 *et seq.*

Current federal law authorizes the Public Housing Administration (PHA) to enter into a contract with public housing authorities for annual contributions of federal funds to assist in achieving and maintaining low rent housing projects, 42 *U. S. C. A.* § 1410(a), provided the local governing body enters into an agreement with the local housing authority to provide cooperation, and the local housing authority demonstrates that a gap of at least 20% will exist between the upper rental limits for admission to the proposed low-rent housing and the lowest rents at which private enterprise provides decent, safe and sanitary housing. 42 *U. S. C. A.* § 1415(7)(b). Moreover, no contract for an annual contribution can be made unless the project is exempt from all real and personal property taxes levied or imposed by the state or any political subdivision in which the project is located. However, the contract for an annual contribution must require the local housing agency to make payments in lieu of taxes equal to 10% of the annual rents charged in the projects or such lesser amounts as may be prescribed by state law, or as may appear in the local cooperation agreement, or as may result from the failure of the local governing body to

perform any obligation under the cooperation agreement. If it appears from the local cooperation agreement that the payments in lieu of taxes will not result in a contribution to the project through tax exemption of at least 20% of the annual contribution to be made by the PHA, the amount in lieu of taxes is limited by the agreement to an amount which will not reduce the local contribution below 20%. If the project is not exempt from real and personal property taxes, the contract for annual contributions must provide, in lieu of the exemption and the payments in lieu of taxes, that the state or political subdivision in which the project is situated shall contribute in cash or tax remission an amount equal to the greater of the amount by which the taxes paid exceed 10% of the annual rents or 20% of the annual contribution. 42 *U. S. C. A.* § 1410(h). Thus, in no event should the local contribution be less than 20% of the federal subsidy.

The federal scheme was essentially the same as that outlined above when the 1950 cooperation agreement was signed, except that when 42 *U. S. C. A.* § 1410(h) was originally enacted, it did not require, but merely authorized, provision in the contract for annual contribution that the local authority make payments in lieu of taxes, *United States Housing Act of* 1937, § 10, added by c. 338, § 305(b), 63 *Stat.* 428 (1949), whereas a 1954 amendment required such a provision. *United States Housing Act of* 1937, § 10, as amended, c. 649, § 402, 68 *Stat.* 631 (1954).

Nor was the situation much different in 1939 when the first cooperation agreement was signed by City and Housing. Although subsection (h) of section 1410 did not become part of the federal housing law until 1949, it was substituted for a provision in the original act that no annual contribution from the United States Housing Authority (USHA), predecessor to the PHA, could be made for any project "unless and until the State, city, county, or other political subdivision in which such project is situated shall contribute, in the form of cash or tax remissions, general or special, or tax exemptions, at least 20 per centum of the annual contribu-

tions" provided by the USHA. *United States Housing Act of* 1937, *c.* 896, § 10(a), 50 *Stat.* 891. It was recognized at that time that many state statutes which allowed complete exemptions permitted the local authority or the city in which the authority operated to arrange for payments in lieu of taxes for municipal services furnished the project. The USHA determined that the question of whether payments in lieu of taxes should be made was a decision for the local authority and the local governing body. However, as a matter of policy, the USHA would not approve any project application submitted by a local authority where the contemplated annual payment in lieu of taxes exceeded 5% of the total annual rent. And on the basis of the average payment in cities where projects were approved by the USHA, it was the opinion of that agency that payments in lieu of taxes should not exceed 2 or 3% of the total annual base rent. *Housing Credit,* 24 *C. F. R.* § 631.5 (*Supp.* 1939).

The two agreements with which we are concerned, although differing in language, are alike in effect. Under the 1939 contract, City agreed not to levy, impose or charge "any taxes, special assessments, service fees, charges or tolls against the projects or against the Authority for or with respect to the projects" during the period of physical usefulness of the projects, except for normal charges for water and a local service charge in an amount equal to 3% of the aggregate rents "in lieu of taxes and in lieu of other fees or charges," but not exceeding "the amount of the tax last levied for the benefit of the City upon the property included in the projects prior to the time of its acquisition by the Local Authority." In return City was to furnish without cost or charge to Housing or to its tenants municipal services "of the same character as those furnished for other dwellings and inhabitants of the City," including sewer service. This contract was amended in 1955 by deleting the paragraph providing for a local service charge "in lieu of taxes and in lieu of other fees and charges" and substituting an annual payment "in lieu of taxes" in an amount which, together with any

other payments provided for, would not exceeed "the amount of either (i) 10 percent of the aggregate Shelter rent charged by the Authority * * * or (ii) the amount permitted to be paid by applicable State law in effect on the date any such payment is made, whichever is the lesser," but not exceeding "the amount of the real property taxes which would have been paid to such taxing body for such year if such Projects were not exempt from taxation * * *."

The projects covered by the 1950 agreement were exempt from real and personal property taxes and special assessments, but the local authority was required to make annual payments "in lieu of such taxes and special assessments and in payment for services, improvements and facilities furnished by the City * * * in an amount equal to either (a) ten per cent (10%) of the aggregate Shelter Rent * * * or (b) the maximum amount permitted to be paid by applicable state law in effect on the date of this Cooperation Agreement, whichever is the lower," but not exceeding "the amount of the real property taxes which would have been paid to such Taxing Body for such year if the Project were not exempt from taxation." That which was to be furnished to the local authority and the tenants of its projects were "(i) the public services and facilities which are at the date hereof being furnished without cost or charge to other dwellings and inhabitants in the City," including adequate sewer service, "and (ii) also such additional public services and facilities as may from time to time hereafter be furnished without cost or charge to other dwellings and inhabitants in the City * * *."

It is apparent that the payments in lieu of taxes under the 1950 agreement, limited in amount to what the property would yield in taxes to the City if it were not exempt, attempt to create some parity between private property owners, whose taxes pay for public services and facilities, and Housing. This accounts for the contract language which, in characterizing the then current and additional public services and facilities that City may provide, described them as those furnished "without cost or charge to other dwellings

and inhabitants." Housing's contribution, tied to its aggregate shelter rents, may be less than that of the private property owner, but due to the afore-mentioned limitation, it will never be more. We note in the legislative history of the Housing Act a 1949 Senate Report which spoke of payments in lieu of taxes as "fair to the cities" in order to reimburse them "for some part of the municipal expenditures which they make for education and all other services to the occupants of low-rent projects  *  *  *." 1949 *U. S. Code Cong. Serv., p.* 1570. While the federal scheme outlined above would seem to suggest that the federal government is more concerned with assuring a local contribution of at least 20% of its annual contribution than with putting the housing authorities on an even footing with private property owners, we find that City, through the cooperation agreement, attempted to assure the maximum degree of parity possible within the framework of federal law.

A contract, also entered into in 1950 and containing language identical to that now before us, was recently before the Arkansas Supreme Court. In 1955 the City of Blytheville had authorized the construction of a central sewer system by enlarging, extending and improving a sewer district it had created in 1914. It also authorized rates for this sewer service, which the local housing authority refused to pay. The court, adopting the language of the trial court, was of the opinion that "the language here used means simply that it is the intention of the parties to place the Housing Units and the occupants thereof in the same position relative to public services and facilities as the remaining inhabitants of the city and to furnish public services and facilities free only so long as such services and facilities are furnished free to the other inhabitants of the city." *Housing Authority v. City of Blytheville,* 228 *Ark.* 736, 741, 310 *S. W.* 2d 222, 224 (*Sup. Ct.* 1958). The foregoing also expresses the intention of the parties to the 1950 agreement in the instant action.

We also find that the parties intended the 1939 cooperation agreement to have the same effect as that signed in 1950, al-

though the language of the former is somewhat ambiguous. The contract calls for City to furnish public services and facilities "of the same character as those furnished for other dwellings and inhabitants of the City," without a qualifying phrase similar to "furnished without cost or charge" as found in the 1950 agreement. However, "character" is defined as "a distinguishing attribute," *Webster's New Collegiate Dictionary* (2d ed. 1956), and within the context of this contract—which provides for a separate charge for water, normally paid by all property owners, and an "in lieu of" payment for enumerated services, normally paid out of general revenue—we construe "of the same character" to include as a distinguishing attribute the presence or absence of a charge for the services rendered.

This construction is borne out by the actions of the parties subsequent to the signing of the agreement. In 1954 Housing asked City for additional police protection, one of the services expressly covered by the "in lieu of" payment. City advised Housing it was financially unable to furnish additional police protection. On June 16, 1955 City and Housing agreed to supplement the terms of the 1939 contract by providing that the projects were to be furnished such additional police protection as Housing from time to time required and that if City is unable financially to provide such services, "the Local Authority shall deduct from any Payments In Lieu of Taxes due the City * * * such amount as will equal the cost to, and as determined by, the Local Authority of the aforesaid additional police protection." Thus we find City admitting that Housing was entitled to free police protection, as were other property owners and residents of Jersey City, and that because it could not do so, Housing could provide its own police protection at City's expense.

Another ambiguity arises out of the fact that the 1939 contract provides that City shall not "levy, impose, or charge any taxes, special assessments, *service fees, charges* or tolls" against the projects and defines the annual payment by Housing as being "in lieu of taxes *and in lieu of other fees or*

*charges."* Yet the contribution by City, which must equal at least 20% of the annual federal contribution, is defined as "the sum equal to the amount which the City would levy for that year by means of taxes and special assessments for or with respect to the project  *  *  *." The identical provision, *i. e.,* that the local governing body would not "levy, impose or charge any taxes, special assessments, service fees, charges or tolls" appeared in a 1941 cooperation agreement in the *Blytheville* case and in a 1939 cooperation agreement in *Housing Authority v. City of Seattle,* 56 *Wash.* 2d 10, 351 *P.* 2d 117 (*Sup. Ct.* 1960). Both involved sewer service charges. *Blytheville* reached a result similar to the one we now reach, one justice dissenting; *Seattle* reached the opposite result, three judges dissenting. Whatever doubt may have existed prior thereto, the 1955 supplementary agreement cleared up the ambiguity by substituting an entirely new paragraph in connection with the annual payment by Housing, which contains the phrase "in lieu of taxes" instead of the uncertain "in lieu of taxes and in lieu of other fees or charges."

Although we conclude that under the two cooperation agreements Housing is to pay for municipal services for which other property owners pay a separate charge or fee, Housing further argues that, inasmuch as City furnished sewer services without charge prior to 1957, it cannot relieve itself of liability for that service under the contract by creating a sewerage authority, transferring to it the responsibility for providing adequate sewer service, and allowing the authority to charge for the service rendered. It is clear from the 1954 agreement between City and Sewerage that there are two sewer systems used in disposing of sewage; the old system, still operated by City, and the new system operated by Sewerage. The latter offers a new and different service which was not in existence in 1939 or 1950 when Housing and City executed their agreements. Moreover, the 1954 agreement limits the service charges (a) for "the use of such Sewerage Disposal System" and (b) "to pay and provide for the ex-

penses of operation and maintenance of the Sewerage Disposal System." Nowhere in this agreement is there a provision for charges for the operation and maintenance of any part of the old system which, presumably, still offers its services free of charge to all property owners—including Housing —without discrimination.

Affirmed, no costs.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.