Scranton Housing Authority *v.* Scranton, et al.

256

Argued October 5, 1971, before President Judge BOWMAN and Judges CRUMLISH, JR.; KRAMER, WILKINSON, JR., MANDERINO, MENCER and ROGERS.

*Carlon M. O'Malley, Jr.,* for appellant.

*J. Charles Hanahue,* with him *Warren, Hill, Henkelman & McMenamin,* for appellee, The Sewer Authority of the City of Scranton.

*David J. Reedy. Jr.,* Assistant City Solicitor, and *John Dunn, Sr.,* City Solicitor, for appellee, City of Scranton.

OPINION BY JUDGE MANDERINO, December 31, 1971:

This case is an appeal by the Scranton Housing Authority of Scranton, Lackawanna County, Pennsylvania, from a declaratory judgment by the Court of Common Pleas of Lackawanna County. The petition for declaratory judgment was instituted by the Scranton Housing Authority. The lower court in its opinion and

order held that the Scranton Housing Authority was not exempt or immune to sewer rental fees or charges under the terms of cooperative agreements entered into between the City of Scranton and the Scranton Housing Authority and that the Scranton Housing Authority is legally obligated to pay sewer rental fees. or charges to the sewer authority of the City of Scranton for use of the sewer system in the City of Scranton pursuant to adopted rates or regulations pertaining thereto.

The question before this court is the interpretation of two cooperative agreements entered into between the City of Scranton and the Scranton Housing Authority. The first agreement, covering certain housing projects, was entered into February 29, 1940 and the second agreement, covering other housing projects, was entered into September 29, 1950.

The 1940 agreement contained the following provisions:

"14. The City agrees that, during the period commencing with the date of the acquisition of any part of the site for the Project, and continuing throughout the useful life of the Project, it will furnish, without cost or charge to the Project or the tenants thereof, with the exception of the Local Annual Service Charge as hereinafter provided, municipal services and facilities for the Project and the tenants thereof, of the same character as those furnished or to be furnished without cost or charge for other dwellings and inhabitants in the City, including but not limited to: fire, police and health protection and services, fire hydrant service, street maintenance, snow removal, garbage, trash and ash collection and disposal, street lighting on public streets within the Project and the boundaries thereof, sewer services; and it will maintain in good repair and working order any and all municipal utili-

ties *and* facilities, provided by it for the use and benefit of the Project and the tenants thereof.

"15. For the municipal services and facilities furnished by the City for the Project and the tenants thereof pursuant to the provisions of paragraph 14 of this Agreement, the Authority shall pay to the City annually in lieu of taxes and in lieu of other fees **or** charges, a sum. . . ."

The 1950 agreement provided:

"5. . . . the Municipality without cost or charge to the Local Authority or the tenants of such Project (other than the Payments in Lieu of Taxes) shall:

"(a) Furnish or cause to be furnished to the Local Authority and the tenants of such Project public service and facilities of the same character and to the same extent as are furnished from time to time without cost or charge to other dwellings and inhabitants in the Municipality; . . . ."

The 1958 and 1966 amendments to the 1950 agreement provided for additional housing units to be constructed by the Scranton Housing Authority and further provided that the other terms of the said contract would remain in full force and effect and the rights and liabilities of the parties as established by the said agreement would otherwise remain the same.

At the time of the 1940 and 1950 agreements there was no charge for sewer facilities by the City of Scranton to the inhabitants of the City of Scranton.

In 1953 the City of Scranton created the Sewer Authority of the City of Scranton. The Scranton Sewer Authority and the City of Scranton then entered into a lease agreement wherein the City of Scranton was the lessee and as such leased from the Sewer Authority of the City of Scranton the sewage facilities in the City of Scranton. Under the terms of the lease, the City of Scranton is to charge rates to the users of the sew-

age facilities in the City of Scranton, which rates were pledged to the sewer authority as the lessor to be used by the Sewer Authority for funding certain revenue bonds of the sewer authority of the City of Scranton. In April, 1970 the Scranton Housing Authority received bills representing sewer rentals or charges for the use of the sewers and the sewage system in the City of Scranton by its tenants, which bills had been received from the Sewer Authority of the City of Scranton, which by agreement with the City of Scranton prepares and mails said bills for the sewer rental and collects the said revenues.

The Scranton Housing Authority argues that the cooperation agreements require the City of Scranton to provide sewage for its various projects and the inhabitants thereof without charge and the attempt by the Scranton Sewer Authority acting for and on behalf of the City of Scranton to charge and collect sewer rentals represents a violation of the terms of those agreements. The City of Scranton and the Sewer Authority of the City of Scranton, on the other hand, take the position that sewer services are to be provided free for so long as same are provided to other inhabitants of the City free, and since the City of Scranton is now charging the inhabitants of the City for the use of the sewage system, that the Scranton Housing Authority is no longer entitled to the service free as has been provided in the past.

The case law is clear that the cardinal rule in interpretation of contracts is to ascertain intention of parties and give effect to that intention if it can be done consistently with legal principles. *Foulke v. Miller,* 381 Pa. 587, 112 A. 2d 124 (1955).

We believe that the Housing Authority is attempting to place limitations in the cooperative agreements which are not there.

Section 14 of the 1940 agreement contains the key language in that agreement. That language in Section 14 states: "The city agrees that . . . throughout the useful life of the project, it will furnish, without cost or charge . . . municipal services and facilities . . . of the same character as those furnished or to be furnished without cost or charge for other dwellings and inhabitants in the City. . . ." The language states that the Housing Authority will not be charged (except for the annual service charge) for any municipal services and facilities of the same character as those furnished or to be furnished without cost or charge to other inhabitants. This obligation is stated to be the obligation of the city throughout the useful life of the housing project. The Housing Authority would have us read into the language an interpretation that services being furnished on the date the agreement was signed must continue to be furnished free even if other inhabitants are later charged. This is not what the language says.

Similarly, if we look at the controlling language of the 1950 agreement, we can find no words of limitation. The municipality's obligation is to furnish without cost (except payments in lieu of taxes) ". . . services and facilities of the same character and to the same extent as are furnished from time to time without cost or charge to other dwellings and inhabitants in the municipality." Significantly, the 1950 agreement uses the words "from time to time." The municipality must furnish services and facilities of the same character and to the same extent as are furnished *from time to time* without cost or charge to other dwellings or inhabitants in the municipality.

We think the Housing Authority's interpretation would require us to read into the cooperative agreements a limitation as to time which is not present. Neither agreement states that at the time of the sign-

ing of the agreements there was determined for all time the services which were to be furnished by the municipality free of charge. We cannot read such a limitation into the agreements.

A reasonable interpretation of these cooperative agreements, we believe, is that the intention of the parties was that the Housing Authority be exempt from sewer rentals only so long as no such rentals were imposed upon other taxpayers.

We agree with the lower court that the intent of the agreements was to place the Housing Authority in the same position relative to public services and facilities as the remaining inhabitants of the city, and to furnish public services and facilities free only so long as such services and facilities are furnished free to the other inhabitants of the city.

Questions similar though not identical to those involved in this proceeding have been before other courts. The same conclusion was reached in *Housing Authority of the City of Blytheville v. City of Blytheville*, 310 S.W. 2d 222 (1958) and *Jersey City Sewage Authority v. Housing Authority of the City of Jersey City et al.*, 190 A. 2d 870 (1963). A contrary result was reached in *City of Seattle v. City of Seattle*, 351 P. 2d 117 (1960).

The Housing Authority has also contended that it will have serious economic problems and other complications in the conduct of its affairs if it is required to pay the sewer rentals. None of the reasons advanced are, however, sufficient to invalidate the existing contractual agreements.

We wish to also comment on the jurisdiction of the Commonwealth Court in this case. Appellant relies on Section 402(4) of the Appellate Court Jurisdiction Act. In our opinion this Court does not have jurisdiction under Section 402(4). The appellee has not chal-

lenged this Court's jurisdiction. In such a situation this Court *may* retain jurisdiction under Section 503 of the Appellate Court Jurisdiction Act. We have done so to avoid further delay which will be occasioned by a transfer of this case. In doing so the Court does not intend to imply that such jurisdictional matters will not be raised by the Court itself in other cases.

The decision of the lower court is affirmed.