[No. 34916. *En Banc.* April 14, 1960.]

HOUSING AUTHORITY OF THE CITY OF SEATTLE, *Respondent,* v. THE CITY OF SEATTLE *et al., Appellants.*[1]

[1]Reported in 351 P. (2d) 117.

*A. C. Van Soelen* and *Frank W. Draper*, for appellants.

*Little, LeSourd, Palmer, Scott & Slemmons, F. A. Le-Sourd*, and *Max D. Crittenden*, for respondent.

OTT, J.—The Housing Authority of the city of Seattle (hereinafter referred to as the authority) entered into a "1939 Cooperation Agreement" with the city of Seattle hereinafter referred to as the city) to construct two low rent housing projects referred to as Wash. 1-1 and Wash. 1-5, commonly called Yesler Terrace and Yesler Terrace Addition. The agreement provided, *inter alia*:

"The City further agrees that during the period commencing with the date of the acquisition of any part of the site or sites of each Project and continuing *throughout the useful life of such Project*, it will not levy, impose or charge any taxes, special assessments, *service fees, charges* or *tolls* against the Project or against the Authority for or with respect to the Project, and that it will furnish, without cost or charge to the Authority and the tenants of each Project, the *usual municipal services* and facilities *which are or may be furnished free* to other dwellings and inhabitants in the City, including but not limited to: Fire, police and health protection and services, street maintenance and repair, garbage, trash and ash collection and disposal, street lighting on public streets within any Projects and on the boundaries thereof. The term 'useful life of such Project', as used in

this paragraph, shall mean the period of physical usefulness of the particular Project for the purpose of providing dwelling accommodations, but in no event less than the number of years during which any of the bonds issued to aid in financing the development of such Project or any bonds issued to refund such bonds shall remain outstanding." (Italics ours.)

At the time the agreement was entered into, the city was furnishing sewer service to "dwellings and inhabitants in the City" without special charge therefor.

August 22, 1955, the city passed ordinance No. 84390, which became effective October 1, 1955. The ordinance provided, *inter alia*:

"There is hereby charged to all premises served by water within the corporate limits of the City of Seattle, a sewerage charge in accordance with the following schedule: . . ."

The authority contended that, by virtue of the "cooperation agreement," it was exempt from the sewer charge established by the ordinance. The city disagreed. The authority commenced this action seeking a declaration of its rights under the cooperation agreement with the city, and to enjoin the collection of the sewer service charge.

The trial court declared that the authority was exempt from the payment of the charge and entered judgment accordingly. The city has appealed.

Appellant city contends (1) that, under the agreement, it was obligated to provide the authority sewer service without charge only so long as such service was furnished free to others, and (2) that, if the agreement is construed otherwise, it is *ultra vires* and void for the reason that a municipality cannot contract or otherwise bargain away its police powers.

We find no merit in either of appellant's contentions.

Did the city, by the cooperation agreement, obligate itself to furnish sewer service free for the "useful life of such Project," or only for so long as such service was furnished free to others?

The cooperation agreement is the result of legislation enacted by both the Federal and state governments. In 1937,

Congress passed the low rent housing act (50 Stat. 888). Section 1 thereof declared it to be "the policy of the United States to promote the general welfare of the Nation by employing its funds and credit . . . to assist the several States . . . to remedy the unsafe and insanitary housing conditions . . . " Section 10(a) provides:

" . . . No part of such annual contributions by the Authority shall be made available for any project . . . until the . . . city . . . shall contribute, in the form of cash or tax remissions, general or special, or tax exemptions, at least 20 per centum of the annual contributions herein provided. *The Authority shall embody the provisions for such annual contributions in a contract guaranteeing their payment over such fixed period: . . .*" (Italics ours.)

The legislature, in order to authorize municipal corporations to qualify for the benefits of the Federal low rent housing act, passed Laws of 1939, chapters 23 and 24, pp. 53, 75, referred to as the "Housing Authorities Law" and the "Housing Cooperation Law," respectively. Chapter 23 declared that there existed in this state insanitary and unsafe dwelling accommodations for persons of low income, which "constitute a menace to the health, safety, morals and welfare of the residents of the state," and "for which public money may be spent." It authorized the establishment of local housing authorities and empowered them to enter into agreements with the Federal government and other governmental units, declaring that

" . . . It is the purpose and intent of this act to authorize every authority to do any and all things necessary or desirable to secure the financial aid or cooperation of the Federal government in the undertaking, construction, maintenance or operation of any housing project by such authority." Laws of 1939, chapter 23, § 21, p. 72.

The act further provided that authority property is public property and "shall be exempt from all taxes and special assessments of the city." Laws of 1939, chapter 23, § 22, p. 73.

Chapter 24, the "Housing Cooperation Law," *inter alia,*

empowered state public bodies (cities) to aid housing authorities. Section 4, p. 77, provides:

"For the purpose of aiding and cooperating in the . . . construction or operation of housing projects . . . any state public body may upon such terms, with or without consideration, as it may determine: . . .

"(e) Cause services to be furnished to the housing authority of the character which such state public body is otherwise empowered to furnish; . . .

"(j) Enter into agreements (which may extend over any period, notwithstanding any provision or rule of law to the contrary), with a housing authority respecting action to be taken by such state public body pursuant to any of the powers granted by this act. . . ."

As authorized by these statutes, the city agreed with the authority that

". . . [1] throughout the useful life of such Project, it will not levy, impose or charge any taxes, special assessments, *service fees, charges or tolls* against the Project or against the Authority for or with respect to the Project, and [2] that it will furnish without cost or charge to the Authority and the tenants of each Project, the usual municipal services and facilities which are or may be furnished free to other dwellings and inhabitants in the City, . . ." (Italics ours.)

■ A part of the city's contribution toward the construction and maintenance of this low cost housing project was to waive service charges to the tenants and to the authority. The charge for sewer service imposed by ordinance No. 84390 is such a service charge. The ordinance itself designates the sewer charge as a charge: "There is hereby *charged* . . . a *sewerage charge* in accordance with the following schedule: . . ." (Italics ours.) The charge is one which reasonably falls within the classification of those charges which the city agreed not to impose.

The city further agreed, as a part of its contribution, to furnish the "usual municipal services and facilities which are or may be furnished free to other dwellings and inhabitants." Appellant contends that the words, "which are or may be furnished free," were used as words of condition, that is, that it agreed to furnish these usual municipal ser-

vices free only so long as they were furnished free to others. We do not agree.

 Reading the agreement as a whole, it is apparent that the parties intended that the projects be furnished free the usual municipal services. It is obvious that the word "usual" alone is not adequate to describe what municipal services the projects were to receive free. The agreement describes the usual services as those which "are" (in 1939) furnished free and those which may in the future be furnished free. The municipal sewer service was furnished free in 1939 when the cooperation agreement was entered into. It is a "usual municipal service" that the city promised to provide without charge to the authority for the "useful life of such Project." The words used are not words of condition, as appellant contends, but are words of description, and the trial court was correct in concluding that the city had exempted the authority from the payment of sewer charges for the "useful life of such Project."

Is the agreement *ultra vires* and void because thereby the municipality has bargained away its police power?

 To provide adequate sewer service is a proper exercise of a municipality's police power. The collection of the sewer service fees or charges imposed is not an exercise of its police power. The charge establishes a debtor-creditor relationship between the user and the municipality. Under the circumstances here present, the legislature has authorized a city which desires to qualify under the act to waive the collection of the charge or debt. Laws of 1939, chapter 23, § 22, p. 73. By the waiver of the charge, the city did not bargain away its police power; rather, it did what the legislature authorized it to do, namely, waive the collection of the charge in consideration of the furtherance of a public purpose and to receive the benefit of low cost housing.

The judgment is affirmed.

WEAVER, C. J., HILL, FINLEY, FOSTER, and HUNTER, JJ., concur.

MALLERY, J. (dissenting)—I do not agree with the inter-

pretation which the majority put upon the language of the following clause in the agreement:

" . . . and that it will furnish, without cost or charge to the Authority and the tenants of each Project, the usual municipal services and facilities *which are or may be* furnished free to other dwellings and inhabitants in the City, . . . " (Italics mine.)

I think the italicized words are mere surplusage and add nothing to the meaning of the clause, which was intended to shield the project against discrimination, but not to grant it any preference. However inept the language in question is, it was obviously intended to place the project and the other inhabitants of the city upon a parity as to free municipal services, both as to the present and in the future.

In other words, services *which are* presently free to the other inhabitants must be presently free to the project. Any services which *may be* free to the other inhabitants in the future must also be free in the future to the project.

I dissent.

DONWORTH and ROSELLINI, JJ., concur with MALLERY, J.

----

June 17, 1960. Petition for rehearing denied.