[No. 49739-7. En Banc. October 28, 1983.]

THE WASHINGTON STATE HOUSING FINANCE COMMISSION, *Petitioner*, v. ROBERT S. O'BRIEN, ET AL, *Respondents*.

492

*Preston, Thorgrimson, Ellis & Holman,* by *Larry M. Carter* and *Jay A. Reich,* for petitioner.

*Kenneth O. Eikenberry, Attorney General,* and *Philip H. Austin, Senior Deputy,* for respondents.

DIMMICK, J.—Does the authority granted by the Legislature to the Washington State Housing Finance Commission violate the Washington State Constitution which prohibits

lending of the state's credit? We find that it does not.

The Legislature created the Commission after investigating the impact of Washington's severe economic recession on the state's housing needs. It found that the sustained high interest rate in the mortgage market precluded home buying for many low to middle income families. The ramifications from the stagnate housing market were numerous. Home construction was at record lows, and current housing supply was critically below the population's needs, for both home buyers and renters. Many persons unable to procure financing to buy homes were forced into the rental market. With rental housing in high demand, low income units became difficult to find. Increasingly, substandard housing became occupied.

Recognizing both the housing need and the downward spiral effect on the state's economy if the housing situation were not remedied, the Legislature established a home mortgage program. Laws of 1983, ch. 161. Program funds are to be generated from the Commission's issuance of nonrecourse tax–exempt revenue bonds pursuant to federal law.[1] Using bond proceeds, the Commission is authorized to invest in, purchase, or make commitments to purchase home mortgages to provide "decent, safe, sanitary, and affordable housing for eligible persons". Laws of 1983, ch. 161, § 5, p. 697. Payments made on such loans will be remitted to the Commission's trustee bank by the lender. All payments, along with bond proceeds, are held in trust for the benefit of bondholders.

To commence the program, the Commission adopted two resolutions on August 3, 1983. The first authorized the issuance of revenue bonds for mortgage aid to first–time home buyers. The second resolution authorized revenue bonds to aid mortgagors of qualified multifamily residential

---

[1] Section 103(a)(1) of the Internal Revenue Code provides tax–exempt status for certain government bonds. Bonds issued for residential housing programs are tax exempt only if they meet the specific criteria of I.R.C. sections 103A and 103(b)(4)(A).

housing. The chairman and secretary refused to sign the resolutions after being advised that they might be unconstitutional. The Commission thereupon brought this mandamus action to compel their signatures on both resolutions. We find the petition meritorious and grant the writ.

Although the course of decisions under the Washington Constitution's lending of credit prohibition[2] has not been smooth, this court has firmly rejected, as violations of the clause, any legislative appropriation of tax revenues at the solicitation of private enterprise to aid or subsidize private commercial ventures. *See, e.g., State Hwy. Comm'n v. Pacific Northwest Bell Tel. Co.*, 59 Wn.2d 216, 367 P.2d 605 (1961); *Johns v. Wadsworth*, 80 Wash. 352, 141 P. 892 (1914). At the time of our constitutional convention, fear of powerful corporate entities was uppermost in the minds of the convention members. The disastrous consequences to taxpayers as a result of corporate political clout were well known. Knapp, *The Origin of the Constitution of the State of Washington*, 4 Wash. Hist. Q. 227, 239–40 (1913). The concern of the constitutional convention was "protection of [the] weak from the strong within." *Journal of the Washington State Constitutional Convention, 1889*, at 682 (B. Rosenow ed. 1962). The constitutional framers believed that government was not instituted to confiscate private property through taxation to enhance corporate profit. *Journal.* Nor did they consider it proper for the State to put taxpayers at undeterminable risk by pledging future tax revenues for private benefit. *See* Knapp, at 270–71.

In the past we did not distinguish whether tax revenues or the state's status was used to confer a benefit. *See, e.g., Washington Health Care Facilities Auth. v. Ray*, 93 Wn.2d 108, 605 P.2d 1260 (1980). Recently, however, we have focused primarily on the risk that the state program

---

[2]Const. art. 8, § 5 provides:

"The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation."

posed to the public treasury or taxpayer. *In re Marriage of Johnson,* 96 Wn.2d 255, 634 P.2d 877 (1981). In doing so, we recognized that the constitutional convention did not intend to hinder state government from carrying out its essential function to secure the health and welfare of the state's citizens. *In re Marriage of Johnson,* 96 Wn.2d 255, 634 P.2d 877 (1981); *Rauch v. Chapman,* 16 Wash. 568, 48 P. 253 (1897). Certainly, the lending of credit clause was not intended to insulate taxpayers from all risk and debt accruing from the public decisions of their governing representatives. Risk flowing from public ventures legitimately undertaken is inherent in our form of government. The difficulty underlying the lending of credit decisions is making the distinction between proper risk to the taxpayer from public decisionmaking, and improper risk to taxpayers due to abdication of public control over the state's assets or status to private commercial decisionmaking.

The "risk of loss" approach requires us to evaluate whether the state program "has safeguards absent in the schemes of the nineteenth century." *In re Marriage of Johnson, supra* at 268. The safeguards must ensure that "[t]he public controls both the use of the State conferred 'asset' and the extent of its liability." *In re Marriage of Johnson, supra* at 268. The State must also retain the means to effectuate the project's public objective. Because these safeguards are central to the lending of credit clause, we now extend the same inquiry to state projects financed by nonrecourse revenue bonds.

We are satisfied that the Commission's authority meets these criteria. The primary purpose of the Commission's program is not to enhance the private sector's profit at the taxpayer's expense, but rather to make decent housing available statewide.[3] In determining legislative motive, we

---

[3]Section 1 of the housing financing act provides in part:

"It is declared to be the public policy of the state and a recognized governmental function to assist in making affordable and decent housing available throughout the state and by so doing to contribute to the general welfare. Decent housing for the people of our state is a most important public concern. Interest

give great weight to the statutory declaration of purpose. *Public Empl. Relations Comm'n v. Kennewick*, 99 Wn.2d 832, 664 P.2d 1240 (1983). While a legislative declaration does not conclusively establish its legitimacy, we accept the declaration unless it is shown to be arbitrary or unreasonable. The facts in the present controversy indicate that the legislative purpose, to rectify state housing deficiencies, is eminently reasonable.

The Legislature had before it studies and testimony on the state's economy and the housing market. From these they reasonably concluded that a public problem existed requiring state action. Uncontroverted testimony indicated that a significant portion of the state's population was inadequately housed. Further, it was apparent that the private sector had been unable to correct the housing scarcity resulting from continuing high interest rates and escalating construction costs.

The adequacy of private housing and the health of the state's economy have traditionally been concerns of state government. *See, e.g., Housing Auth. v. Seattle*, 56 Wn.2d 10, 351 P.2d 117 (1960). The range of remedies available to meet these state problems must necessarily be wide. We leave the wisdom of a chosen remedy in the legislative arena. Obviously, if the program is successful, the private sector will benefit through increased housing starts, and increased activity in the housing and mortgage markets. Mortgage lenders will be entitled to an origination fee

---

rates and construction costs have made it impossible for many Washington citizens to purchase their own homes. Older people, disabled persons, and low and moderate income families often cannot afford to rent decent housing. There exists throughout the state a serious shortage of safe, sanitary and energy efficient housing available at prices within the financial means of our citizens. General economic development within the state is also impeded by a lack of affordable housing. The state's economy, which is dependent on the timber, wood products, and construction industries, has been damaged by inadequate investment in housing construction and rehabilitation. The result has been high unemployment and economic hardship affecting the prosperity of all the people of the state, particularly those in the wood products industry." Laws of 1983, ch. 161, § 1, p. 693–94.

established by the Commission even though the Commission subsequently purchases the mortgage. Additionally, participating lenders will be compensated for servicing the mortgages (collecting mortgage payments, insurance premiums and property taxes, and making appropriate remittances to the Commission's trustee bank). Although we are inclined to view these fees as compensation rather than profit, the profit, if any, to actually be realized is speculative and subject to marketplace vagaries.

Our discussion of legislative motive does not imply that a finding of public purpose validates an otherwise impermissible lending of credit. *State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 399 P.2d 623 (1965). *See In re Marriage of Johnson, supra* at 266. Gratuitous state aid to private enterprise or private persons although for a laudable public purpose is prohibited by our constitution. But state aid to a circumscribed class of the public, in furtherance of legitimate state objectives, may provide the necessary "consideration" for the aid. *See Public Empl. Relations Comm'n v. Kennewick, supra* at 837–38. We review the legislative purpose to confirm that the statutory objective is to benefit a deserving class of the public.

Nor should we be understood as taking upon ourselves the business of determining who belongs in the benefited class. In early cases upholding aid to the "poor and infirm," we deferred to the legislative determination of what constituted need. *State v. Guaranty Trust Co.*, 20 Wn.2d 588, 148 P. 323 (1944). Our only task is to assess the reasonableness of that determination.

The Legislature found that persons at certain income levels could not afford adequate housing. The resulting high demand for rental units forced many low income persons into substandard housing. The Legislature's criteria for mortgage loan eligibility ensure that these persons' needs are met. The Commission's eligibility standards must consider at least the following: income; family size; cost, condition and energy efficiency of available residential housing; availability of decent, safe, and sanitary housing; age or

infirmity of recipients. Laws of 1983, ch. 161, § 5(2), p. 697. These guidelines establish a reasonable nexus between the recognized need and the persons to be benefited.

Accordingly, we conclude that the purpose of the mortgage loan program is to benefit a class of citizens reasonably determined to require public aid to meet their housing needs, and not to benefit a specific private enterprise. Because such a purpose is well within the legitimate purview of state government, it does not conflict with the lending of credit prohibition.

We further find that the Legislature has enacted safeguards that retain public control over the extent of risk to the taxpayers and effectuation of the program's public purpose. In reviewing the statutory safeguards, our function is not to weigh the economic risk but only to ascertain that risk to the State remains within public control and is not abdicated to the private sector. The controls imposed on the mortgage loan program are impressive. The most significant risk to taxpayers from publicly financed projects is loss of tax revenues or pledging of future revenues. Under the mortgage loan program, however, there is no risk of this kind. Program funds must be derived entirely from the investment market, not from state appropriations. Laws of 1983, ch. 161, § 8(7), p. 700. The funds never enter the state treasury but are held in a special trust account. § 17, p. 704. The bonds, although issued in the Commission's name, must contain a recital that they are not state obligations. § 3, p. 695. Any obligation arising from the sale of bonds or the program is an obligation only of the Commission's special fund. § 3, p. 695; § 28, p. 710. *State Health Care Facilities Auth. v. Spellman*, 96 Wn.2d 68, 633 P.2d 866 (1981); *State Health Care Facilities Auth. v. Ray*, 93 Wn.2d 108, 605 P.2d 1260 (1980).

Whether bond default would impact the state's credit rating is open to question. *See* 50 Wash. L. Rev. 440, 464–67 (1975). At least two factors minimize any potential risk to the state's credit rating. Unlike the situation in *Chemical Bank v. Washington Pub. Power Supply Sys.*, 99

Wn.2d 772, 666 P.2d 329 (1983), a constitutional challenge has been brought prior to bond sales. In further contrast, the bonds are secured in case of default by property with relatively high marketability. Interestingly, a market evidently exists for these bonds despite the recent default on nuclear power plant bonds.

Other risks to taxpayers are kept within the public control. The authority to issue bonds is limited in amount and expires in 1986. Laws of 1983, ch. 161, § 5(a), p. 697. The Commission's plan for raising and using program proceeds is subject to public hearing. § 7, p. 698. The Commission has authority to set standards and guidelines for private lenders to follow in disbursement of program funds. § 8(1), p. 699.

These controls also assure that the public objectives of the program will be met. Legislative intent in this regard is underscored by the requirement that program proceeds are to be made available to mortgagors in a fair and equitable manner. § 12, p. 702. The Commission's program must meet other specific objectives, including the housing needs of low–income and moderate–income persons, the elderly and handicapped.[4] § 7, p. 698.

The Legislature's carefully conceived safeguards convince

---

[4]The objectives the Commission must consider include:

"(1) The use of funds for single–family and multifamily housing;

"(2) The use of funds for new construction, rehabilitation, including refinancing of existing debt, and home purchases;

"(3) The housing needs of low–income and moderate–income persons and families, and of elderly or mentally or physically handicapped persons;

"(4) The use of funds in coordination with federal, state, and local housing programs for low–income persons;

"(5) The use of funds in urban, rural, suburban, and special areas of the state;

"(6) The use of financing assistance to stabilize and upgrade declining urban neighborhoods;

"(7) The use of financing assistance for economically depressed areas, areas of minority concentration, reservations, and in mortgage–deficient areas;

"(8) The geographical distribution of bond proceeds so that the benefits of the housing programs provided under this chapter will be available to address demand on a fair basis through the state;

"(9) The use of financing assistance for implementation of cost–effective energy efficiency measures in dwellings." Laws of 1983, ch. 161, § 7, p. 698.

us that the State is not impermissibly abdicating its responsibility over the use of state status or the extent of state liability to the private sector. Finding that the state housing finance program is consistent with the State's legitimate function and that the risk to the state's taxpayers and effectuation of the public purpose remain under public control, we hold that the Commission's authority under Laws of 1983, ch. 161 does not violate Const. art. 8, § 5.

We therefore grant the writ of mandamus and order the chairman and secretary to sign the Commission's resolutions.

WILLIAMS, C.J., and UTTER, DOLLIVER, and PEARSON, JJ., concur.

ROSELLINI, J. (dissenting)—I read the majority opinion as providing that the Washington State Constitution does not prohibit lending of the State's credit when it supports a statutory objective to benefit a deserving class of the public. I disagree.

Both article 8, section 5 and article 12, section 9 of the Washington State Constitution provide that the credit of the State shall not, in any manner, be given or loaned to, or in aid of any private individual, association or corporation.

It is clear that the State or a municipality lends its credit whenever it allows its unique governmental status or authority to be utilized for the purpose of enabling a private corporation or individual to obtain property or money which it could not otherwise acquire for the same price.

The Washington State Housing Finance Commission would be doing just that by passing on to private, nonindigent home buyers or tenants the substantial benefit of its unique ability (as a State instrumentality) under the Internal Revenue Code to issue bonds at tax exempt rates of interest.

That the loan of credit serves a laudable public purpose does not validate an otherwise unconstitutional loan or gift

of state or municipal credit. In *Lassila v. Wenatchee,* 89 Wn.2d 804, 576 P.2d 54 (1978), this court held that Const. art. 8, § 7 absolutely prohibits a municipality from acting as a conduit for private enterprise. In response to the argument that the loan of credit served a laudable public purpose, the *Lassila* court states, at pages 811–12:

An expected future public benefit also does not negative an otherwise unconstitutional loan. We have repeatedly held that a loan of money or credit by a municipality to a private party violates Const. art. 8, § 7 regardless of whether it may serve a laudable public purpose. *Japan Line, Ltd. v. McCaffree,* 88 Wn.2d 93, 98, 558 P.2d 211 (1977); *Port of Longview v. Taxpayers,* 85 Wn.2d 216, 231, 533 P.2d 128 (1974); *State ex rel. O'Connell v. Port of Seattle,* [65 Wn.2d 801, 399 P.2d 623 (1965)] at 805–06. As we said in *Johns v. Wadsworth,* 80 Wash. 352, 354, 141 P. 892 (1914):

The section of the constitution last quoted, in most express terms, prohibits a county from giving any money, property or credit to, or in aid of, any corporation, *except for the necessary support of the poor and infirm.* If the framers of the constitution had intended only to prohibit counties from giving money or loaning credit for other than corporate or public purposes, they would doubtless have said so in direct words. That agricultural fairs serve a good purpose is not questioned, but the constitution makes no distinction between purposes, but directly and unequivocally prohibits all gifts of money, property, or credit to, or in aid of, any corporation, subject to the exception noted.

*See also Port of Longview v. Taxpayers, supra* at 231. Unquestionably, the City's desire for a multipurpose theater adjacent to its contemplated community center is a commendable purpose. But, a *salutary purpose does not validate an unconstitutional loan.*

The City contends we should liberally construe Const. art. 8, § 7 so that an expected future benefit will validate the loan. But, as we said in *State ex rel. O'Connell v. Port of Seattle, supra* at 806:

If Article 8, § 7 is too restrictive in its terms, *that is a matter for the citizens of this state to correct through the amendatory process.* It is not for this court to engraft an exception where none is expressed in the

constitutional provision, no matter how desirable or expedient such an exception might seem.

Accordingly, the expected receipt of future public benefits cannot serve to validate an otherwise unconstitutional loan of credit.

(Italics mine.)

A decision of similar import is *Port of Longview v. Taxpayers of Port of Longview,* 85 Wn.2d 216, 533 P.2d 128 (1974). In response to an addition to the Internal Revenue Code, which generally provided that for federal income tax purposes gross income does not include interest on the obligations of a state or political subdivision of a state issued to provide for air or water pollution control facilities, our State Legislature enacted legislation which sought to allow port districts to make available pollution control facilities to nonpublic entities. The act allowed this to be done by lease, lease purchase agreement, or other agreement binding such user to pay for the use of said facilities for the full term of the revenue bonds issued by the port for the acquisition of said facilities.

This court held this form of financing constitutes the loaning of money or credit by a municipality to any private party in violation of article 8, section 7. In *Port of Longview* this court approvingly adopted the following language of the Nebraska Supreme Court:

> It seems clear to us that the revenue bonds are issued by the city in its own name to give them a marketability and value which they would otherwise not possess. If their issuance by the city is an inducement to industry, some benefits must be conferred, or it would be no inducement at all. Such benefits, whatever form they may take, necessarily must be based on the credit of the city. The loan of its name by a city to bring about a benefit to a private project, even though general liability does not exist, is nothing short of a loan of its credit. . . .
>
> . . .
>
> . . . It is not material what such undertakings may be called, or what forms are devised to conceal their main purpose, or how worthwhile they may appear to

be, when the question of constitutionality is presented, their substance will be examined. The financing of private enterprises with public funds is foreign to the fundamental concepts of our constitutional system. To permit such encroachments upon the prohibitions of the Constitution would bring about, as experience and history have demonstrated, the ultimate destruction of the private enterprise system.

*Port of Longview,* at 227 (quoting *State ex rel. Beck v. York,* 164 Neb. 223, 227, 229–30, 82 N.W.2d 269 (1957)).

The Nebraska Constitution was subsequently amended to specifically permit the kinds of financial arrangements found by the court in *Beck* to be violative of the ban against loan of credit. The Washington Constitution has also been amended to permit nonrecourse revenue bonds and obligations to be used to finance industrial development projects. *See* Const. art. 32, § 1 (amend. 73).

Although article 8, section 7 is differently worded than article 8, section 5, both provisions have been repeatedly held to have the same general effect. *See, e.g., Anderson v. O'Brien,* 84 Wn.2d 64, 524 P.2d 390 (1974); *State Hwy. Comm'n v. Pacific Northwest Bell Tel. Co.,* 59 Wn.2d 216, 367 P.2d 605 (1961); *State v. Guaranty Trust Co.,* 20 Wn.2d 588, 148 P.2d 323 (1944); *Morgan v. Department of Social Sec.,* 14 Wn.2d 156, 127 P.2d 686 (1942).

The next point of reference is to *Washington Health Care Facilities Auth. v. Ray,* 93 Wn.2d 108, 605 P.2d 1260 (1980). *Ray* involved the constitutionality under Const. art. 8, § 5 of the issuance of nonrecourse revenue bonds by the Washington Health Care Facilities Authority to provide capital financing for privately owned and operated hospitals or health care facilities. Ultimately, the bonds in *Ray* were sustained. But in the process two separate opinions were written. The lead opinion was a fully reasoned ruling signed by four Justices with another Justice concurring in the result. The second opinion was a short concurring opinion signed by four Justices. The 4–member concurring opinion desired that this court distinguish or overrule all prior cases that held this type of financing contrary to the

prohibition against a lending of credit. The lead opinion, in following prior precedent, states at pages 113–15:

Our holding in *Port of Longview* that the bonding schemes violated article 8, section 7, follows the minority view that nonrecourse development bonding schemes, unless otherwise exempted, constitute loans of credit. *See, e.g., State ex rel. Beck v. York,* 164 Neb. 223, 82 N.W.2d 269 (1957); *State ex rel. Saxbe v. Brand,* 176 Ohio St. 44, 197 N.E.2d 328 (1964). The majority of other jurisdictions have held that nonrecourse revenue bonding schemes are not loans of credit. For a discussion of the majority position, *see,* Recent Developments, *State Constitution—Debt Limitations—Municipality's Issuance of Revenue Bonds to Finance Private Pollution Control Facilities Violates State Constitution,* 50 Wash. L. Rev. 440, 447–49 (1975). We believe that some of the decisions from jurisdictions following the majority approach can be distinguished from the present case on the basis of differences in the constitutional provisions involved. We disagree, however, with the reasoning by which the conclusion is reached in others, that there is no lending of credit without the incurring of new and actual financial liability.

The underlying rationale of the minority view and that of this court is that a state or municipal corporation lends its credit whenever it allows its unique governmental status or authority to be utilized for the purpose of enabling a private corporation or individual to obtain property or money that it could not otherwise acquire for the same price. A state or municipality can "lend its credit" without incurring any actual indebtedness.

. . .

Here, the credit that would be loaned would stem from the unique ability of a public agency, under the Internal Revenue Code, to borrow money at a lower rate of interest than would otherwise have to be paid by a private party. The Authority's challenged actions involve loans of credit inasmuch as the Authority's issuance of the bonds would enable privately owned health care facilities to obtain benefits which they could not otherwise obtain.

This strict interpretation of the lending of credit provision is consistent with our earlier holdings. The people of this state have not amended the constitution to disclaim our broad interpretation of the lending of credit

prohibitions. Rather, they have chosen to carve out only two constitutional exceptions. Amendment 45 (article 8, section 8) was adopted in 1966 in response to *State ex rel. O'Connell v. Port of Seattle,* 65 Wn.2d 801, 399 P.2d 623 (1965). More recently, voters ratified amendment 70 (article 8, section 10), in apparent anticipation of an unfavorable holding if an action were brought challenging public utility loans for energy conservation purposes as unconstitutional loans of credit. As we stated in *Port of Seattle,* at page 806:

> If Article 8, § 7, is too restrictive in its terms, that is a matter for the citizens of this state to correct through the amendatory process. It is not for this court to engraft an exception where none is expressed in the constitutional provision, no matter how desirable or expedient such an exception might seem.

(Footnote omitted.)

The lead opinion then went on to uphold the validity of the bonding program under the constitutionally recognized exception to the prohibition of Const. art. 8, § 5 that the State may provide necessary aid to the poor and infirm. *Ray,* at 115–16.

It has, however, been stipulated in the instant case that

> The Commission [in exercise of its statutory authority] intends to issue tax–exempt nonrecourse revenue bonds for the purpose of assisting in the financing of single family homes for persons who may not qualify under Art. VII, §§ 5 and 7 of the Washington Constitution as either poor or infirm, and for assisting in the financing of multi–family residential rental units the occupants of which may be neither poor nor infirm within the meaning of those sections of the Constitution.

Agreed Statement of Facts, at 10. Thus, the rationale which sustained the bonding program in *Ray* is simply not available to the petitioner in the instant case.

The majority opinion cites our recent decision in *In re Marriage of Johnson,* 96 Wn.2d 255, 634 P.2d 877 (1981) as an indication that we have returned to a "risk of loss" approach in lending of credit cases. I disagree. Initially it should be pointed out that the lead opinion in *Johnson* was signed by only three Justices, with three others concurring

in the result only, one dissenting, and two dissenting in part and concurring in part by separate opinion.

The basic subject matter in *Johnson* was entirely different from the instant circumstances. At issue in that case was the constitutionality of so much of RCW 74.20.040 as authorized the Department of Social and Health Services to collect past due child support for children not receiving public assistance. The constitutional question in *Johnson* could have been clearly obviated by the language of the statute itself which provides for the imposition of a fee to compensate the Department for services rendered in establishment of or enforcement of support obligations. More importantly, the statute in *Johnson* undoubtedly falls within the well established principle that the constitution permits the expenditure of state funds for the performance of recognized governmental *services* as law enforcement, fire protection or consumer protection. *See State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.,* 82 Wn.2d 265, 510 P.2d 233, 59 A.L.R.3d 1209 (1973).

Likewise, *Public Empl. Relations Comm'n v. Kennewick,* 99 Wn.2d 832, 664 P.2d 1240 (1983) merely upheld the Commission's statutorily imposed duty to prevent and remedy unfair labor practices. By enforcing that duty, albeit to the benefit of a private association, the Commission exercises an important public function. Private parties may indeed benefit incidentally as a result of the exercise of that important function; however, as long as the private benefit is incidental to the public purpose served, the legislation is not unconstitutional. *Kennewick,* at 838.

The critical distinction between these two latter cases and those finding a violation of the lending of credit prohibition is that of performing a governmental service, on one hand, and a transfer to private parties of a governmental power or prerogative, on the other. Here, instead of providing a recognized governmental service to the people, the State would be directly (and not merely incidentally) subsidizing private home buyers by acting to pass on to them its own unique ability under the Internal Revenue Code to

issue tax exempt bonds and, thereby, to borrow money at lower interest rates than would otherwise be available to those home buyers in the private sector.

The Legislature, in enacting the housing financing act, could have avoided the constitutional prohibition by limiting eligibility for assistance to those persons with such low incomes and limited assets as to be undeniably poor or needy. Or it could have dealt with the matter as it did with industrial development financing—by proposing to the voters a further constitutional amendment.

Instead, however, it did neither. Rather, without an accompanying constitutional amendment, the Legislature left it to the Housing Finance Commission to set eligibility standards, with income to be only one of the factors to be considered by the Commission in doing so.

I would remain with our well reasoned, established precedent and hold that the authority granted by the Legislature to the Washington State Housing Finance Commission violates the prohibition against lending of State credit.

STAFFORD, BRACHTENBACH, and DORE, JJ., concur with ROSELLINI, J.