[No. 48995-5. En Banc. February 2, 1984.]

THE CITY OF MARYSVILLE, *Respondent,* v. THE STATE
OF WASHINGTON, ET AL, *Appellants.*

ROSELLINI, J., concurs by separate opinion; STAFFORD, J., did not participate in the disposition of this case.

*Kenneth O. Eikenberry, Attorney General,* and *Donald F. Cofer, Assistant,* for appellants.

*James H. Allendoerfer, City Attorney,* for respondent.

UTTER, J.—The City of Marysville refused to pay funds allegedly owed to the Public Employees' Retirement System on the grounds that the payments were unconstitutional as violations of article 8, section 7 of the Washington State Constitution, prohibiting a gift or loan of the City's credit. This position was sustained by the trial court. We reverse, finding no constitutional prohibition applicable in this case.

In January of 1960, the City of Marysville was admitted as a participating employer in the Public Employees' Retirement System, commonly called PERS. Eleven years later, in October of 1971, the City purchased Cedarcrest Golf Course, a private course until the purchase. Three employees of Cedarcrest at the time of its purchase by the City continued their employment with Cedarcrest after the purchase. As employees of the City they became members of PERS.

After the acquisition, the administrators of PERS determined the City's acquisition of the golf course under these circumstances entitled the three members to service credit for their previous service at the course, pursuant to RCW 41.40.160(2). PERS then, in 1972, based on information submitted by the City, billed the City for $14,312.21. This represented the total employer contributions that would have been due pursuant to RCW 41.40.361 if the services rendered to Cedarcrest while it was a private enterprise had been rendered to what RCW 41.40.010(4) defined as an employer.

The City refused to pay these funds claiming such payment was unconstitutional. A complaint was filed in September of 1981 seeking to declare RCW 41.40.160(2) unconstitutional and the Department's claim unenforceable. The Department counterclaimed for the amount due.

After considering all the arguments, the trial court ruled for the City, declaring the statute unconstitutional and the Department's claim unenforceable.

The pivotal issue for decision in this case is whether article 8, section 7 applies to payments from one public entity to another, regardless of whether such payments might be characterized as a gift or loan of money. Article 8, section 7 reads:

> *Credit not to be loaned.* No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any *individual, association, company* or *corporation,* except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

(Italics ours.)

 The City's challenge to the constitutionality of the statute as prohibited under article 8, section 7 must be viewed in light of our recent pronouncement severely limiting the previous scope of our opinions on that subject. In *In re Marriage of Johnson,* 96 Wn.2d 255, 634 P.2d 877 (1981), a plurality of this court examined our earlier erratic decisions and concluded most of them were an unjustified interpretation of the intent of the drafters of article 8, sections 5 and 7 of the constitution. As noted in *In re Marriage of Johnson, supra* at 267:

> The schemes which provided the impetus for provisions like section 5 all involved the actual loss of state assets through either stock and bond purchases or suretyship. At the time these provisions were adopted, "credit" was understood to be "[t]he correlative of a *debt*; . . . that which is incoming or due *to* one." Black's Law Dictionary 299 (1891); . . . The nature of those nineteenth century schemes and that definition suggest that section 5 should prohibit only those activities which jeopardize state assets. Such was recognized in [*State ex rel. Graham v. Olympia,* 80 Wn.2d 672, 676–77, 497 P.2d 924 (1972)]. There, we stated:
>
> > We believe, therefore, that the prohibition was against loans as used in the ordinary and popular sense,

between a lender and a borrower, where a question of the security of funds in such transactions would be involved . . .

. . .

It was the risk of endangering public funds from the loaning of money in the ordinary and popular sense that the framers of our constitution interdicted . . .

The holding of *In re Marriage of Johnson, supra,* was adopted by the majority in *State Housing Fin. Comm'n v. O'Brien,* 100 Wn.2d 491, 671 P.2d 247 (1983). There the majority stated, at pages 494–95:

Recently, however, we have focused primarily on the risk that the state program posed to the public treasury or taxpayer. *In re Marriage of Johnson,* 96 Wn.2d 255, 634 P.2d 877 (1981). . . . Certainly, the lending of credit clause was not intended to insulate taxpayers from all risk and debt accruing from the public decisions of their governing representatives. Risk flowing from public ventures legitimately undertaken is inherent in our form of government.

This narrow interpretation is consistent with the holding of our court in the early case of *Rands v. Clarke Cy.,* 79 Wash. 152, 139 P. 1090 (1914). There a Clarke County taxpayer sought to enjoin the County from issuing bonds and entering into a contract with Multnomah County, Oregon, to jointly construct a bridge across the Columbia River. It was argued that such money expended by Clarke County would be in aid of Multnomah County and therefore violate article 8, section 7. This argument was rejected by the court which observed,

But it will be noticed that the prohibition is against the giving or loaning of money to or in aid of any individual, association, company or corporation, and it is clear that, unless the word, "corporation" can be held to include a county in a foreign state, the county of Multnomah is not included within the prohibition. We think the word cannot be held to have this meaning.

*Rands v. Clarke Cy., supra* at 157. *Foster v. Commissioners of Cowlitz Cy.,* 100 Wash. 502, 508–10, 171 P. 539 (1918). *State ex rel. Wash. Toll Bridge Auth. v. Yelle,* 56 Wn.2d

86, 104, 351 P.2d 493 (1960); *accord, Gallup v. New Mexico State Park & Rec. Comm'n,* 86 N.M. 745, 527 P.2d 786 (1974).

The minutes of the Constitutional Convention also support our interpretation of article 8, section 7. *See Journal of the Washington State Constitutional Convention, 1889,* at 679–84 (B. Rosenow ed. 1962) (analytical index by Q. Smith summarizing the Convention debates on this section as reported by various contemporary journalists). Two days of lively debate followed the presentation of two alternative versions of this section by the Committee on State, County and Municipal Indebtedness. One version, embodied in the majority report, allowed loans and gifts when approved by two–thirds of the voters, while the version contained in the minority report barred them regardless of voter sentiment. Delegate after delegate rose to declare, often in heated terms, that they supported the version which would prohibit the practice of local governments granting direct and often speculative subsidies to private railroad companies.

A few representative excerpts from the debate summaries graphically illustrate how the framers viewed article 8, section 7:

> Crowley of Walla Walla said he believed in home rule and that the people of Walla Walla were benefited by a railroad they had partly constructed. He believed there were enough restrictions in the section to guard against too much indebtedness. He wanted the people to have the power to reward enterprises which tended to further their own good. Dunbar and Crowley vividly portrayed the injustices their counties of Walla Walla and Klickitat had suffered in the transportation of their grain because of extortion practiced by the existing monopolies.
> . . . Griffitts said he would be willing to relieve the people of Klickitat and Walla Walla, but not by means of the Constitution acting for one locality. This he thought vicious. He read from a newspaper to show that the P.B.&V. Railroad, of which Dunbar was president, felt confident of success in a contemplated line in Klickitat County. He was against property being donated to private individuals and so favored the minority report. . . .

. . .
. . . Prosser also supported [the majority report] and said the people of eastern Washington wanted these subsidies. He contended that they should have as much right to subsidize a railroad as to build a county railroad. . . .
. . . Buchanan . . . cited examples of railroad agents entangling people in disastrous schemes. Comegys opposed the motion, not desiring to rob the minority to please the majority. He believed that the majority should subscribe privately as governments were not made for partnerships with corporations. Griffitts showed the difference between this and water works owned by a city to be that the railroad profit goes into private pockets. . . . Turner said he could not support such a vicious measure . . . J. Z. Moore said that the government was not instituted for the confiscation of property to assist private corporations or enterprises.

*Journal of the Washington State Constitutional Convention, 1889,* at 680–82 (debates of July 31 and August 1, 1889).

In short, the framers of our constitution were deeply concerned about the effects on the public purse of granting public subsidies to private commercial enterprises, primarily railroads. They were not concerned about the nonspeculative transfer of money from one nonprofit government agency to another.

The statutory basis of the claim against the City originated with RCW 41.40.160(2) which provides:

Employees of a public utility or other private enterprise all or any portion of which has been heretofore or may be hereafter acquired by a public agency as a matter of public convenience and necessity, where it is in the public interest to retain the trained personnel of such enterprise, all service to that enterprise shall, upon the acquiring public agency becoming an employer as defined in RCW 41.40.010(4) be credited on the same basis as if rendered to the said employer: . . .

There is no contention that the employees who are the subject of this dispute were not qualified under the terms of this statute. Employer contributions, including those required by RCW 41.40.160(2) are paid into a *common*

"benefit account fund" from which all retirement and death benefits are paid. RCW 41.40.100(2). The City is required by statute to make payment to the State to reduce the total unfunded liabilities of the PERS system as a whole.

The trial court viewed the responsibility of the City in a different light and held *Rands* and the decisions subsequent to it did not apply, inasmuch as the State was not receiving the employer contributions required by RCW 41.40.160(2) "in its sovereign capacity . . . but [was] receiving the contributions as trustee for the employees in whose names they are paid." Clerk's Papers, at 8.

This interpretation of the PERS act is unjustified because it is inconsistent with the fundamental structure of the act. Individual members have no legal claim upon the employer contribution fund until they qualify for benefits under the act's provisions. RCW 41.40.010(22), .100(1), (2). Benefits paid at that time are controlled by statutory formulas, not by the amount of or investment return on money in the fund. Funds paid by the City are paid to the public employee retirement system. The individual employee derives no direct gain unless they qualify for a retirement allowance and begin receiving pension payments from the State calculated on the basis of that service credit. Employer contributions required by RCW 41.40.160(2), while determined on the basis of each employee's former salary in the private sector, are not deposited in that employee's account.

The trial court's sovereign/trustee distinction has no significance in light of the way this court views these payments. There are no separate employee accounts but payments to the retirement system instead. In *Rands,* and the subsequent cases interpreting the rule of the *Rands* case, the plain terms of article 8, section 7 do not encompass payments between public entities. This is consistent with the intent of the drafters of that provision and our recent cases returning to that interpretation.

The City also contends that if the funds requested by PERS are for the benefit of the employees, they constitute

a gift or gratuity to a private party in violation of article 8, section 7. This theory is based on the idea that such payments are compensation for past services rendered to a private employer. This argument is unconvincing.

Under Washington law, a pension granted to a public employee is not a gratuity but is deferred compensation for services rendered. *Aldrich v. State Employees' Retirement Sys.*, 49 Wn.2d 831, 833, 307 P.2d 270 (1957); *Bakenhus v. Seattle*, 48 Wn.2d 695, 698, 296 P.2d 536 (1956). *See also* 60 Am. Jur. 2d *Pensions and Retirement Funds* § 2 (1972); 67 C.J.S. *Officers* § 245a (1978). The payment of such compensation by the State is generally conceded to serve a legitimate public purpose. 60 Am. Jur. 2d *Pensions and Retirement Funds* § 39 (1972). *Cf. State ex rel. Hart v. Clausen*, 113 Wash. 570, 194 P. 793, 13 A.L.R. 580 (1921). The only question, then, is whether the fact that the amount of contributions is calculated with reference to how long the subject employees worked for Cedarcrest before it was purchased by the City makes the contributions "gratuitous" because such services had already been rendered.

This court faced a similar question in *Aldrich v. State Employees' Retirement Sys., supra.* Aldrich, a state employee, was assigned to work for the federal government on a temporary basis in 1942. He returned to state employment in 1946. In 1947, the State Employees' Retirement System was created by a statute which provided that "'[s]ervice by a state employee officially assigned by the state on a temporary basis to assist another public agency, shall be considered as service as a state employee.'" *Aldrich*, at 834. The State contended that to consider Aldrich's service with the federal government in calculating his state pension benefits would constitute an unconstitutional gratuity under Const. art. 2, § 25 (amend. 35), because the federal government also paid Aldrich a pension for the same service. We disagreed, stating that prior service credit

for services [rendered] antedating the effective date of the state employees' retirement act cannot, standing

alone, support a pension . . . There must be, in addition thereto, some service rendered *after* the effective date of the act, so that the act will constitute a part of the contract governing the *subsequent* employment. Then the pensions provided for under the act constitute deferred compensation for the *subsequent* service and are not gratuities predicated merely upon the prior service.

(Italics ours.) *Aldrich,* at 833–34. Although the *Aldrich* opinion did not expressly consider whether the contributions were gratuities under article 8, section 7, we find our reasoning in that case to be persuasive here for two reasons.

■■ First, given the statutory language that such credit be granted "where it is in the public interest to retain the trained personnel of such enterprise," RCW 41.40.160(2), it is obvious that the Legislature intended such credit to be a constitutional inducement to experienced private employees to stay on the job after their companies were acquired by public entities rather than an unconstitutional gratuity to such employees. The subject employees provided ample consideration for the pension benefits when they remained at Cedarcrest after its acquisition by the City. *Cf. Twohy v. Harris,* 194 Va. 69, 81, 72 S.E.2d 329, 335–36 (1952) (severance pay); *Bullock v. Sterling Drug, Inc.,* 93 F. Supp. 371, 375 (E.D. Pa. 1950), *aff'd,* 187 F.2d 145 (3d Cir. 1951) (same). Since the consideration for the pension benefits was post–acquisition services, it is entirely irrelevant whether the prior service on which the credit was based was service with a private or public employer.

Second, as noted earlier, this is not the type of "abuse" that the framers of our Constitution were concerned with when they drafted the restrictions contained in article 8, section 7.

We therefore hold that the provisions for prior service credit contained in RCW 41.40.160 were designed to encourage employees to remain in their jobs after acquisition by the City, that such provisions constitute part of the employment contract between the City and the Cedarcrest

employees, and that the employees provided ample consideration for such benefits by remaining on the job after the acquisition. Such benefits were therefore in no sense gratuitous.

The trial court is reversed and the case remanded for entry of judgment in favor of appellants on their counterclaim under RCW 41.40.160(2).

WILLIAMS, C.J., BRACHTENBACH, DOLLIVER, DORE, DIMMICK, and PEARSON, JJ., and MORGAN, J. Pro Tem., concur.

ROSELLINI, J. (concurring)—I concur in the result reached by the majority. However, I am opposed to the majority's needless and continuing attempts to limit the scope of protections guaranteed our citizenry by the constitutional prohibitions of gifts or loans of public money or credit. *See State Housing Fin. Comm'n v. O'Brien,* 100 Wn.2d 491, 500, 671 P.2d 247 (1983) (Rosellini, J., dissenting); *In re Marriage of Johnson,* 96 Wn.2d 255, 268, 634 P.2d 877 (1981) (Dore, J., concurring in part, dissenting in part). The majority makes reference to *Johnson* and *Housing Fin.* as severely limiting the previous scope of our opinions on the subject. The majority indicates that the focus of inquiry is on the "risk of loss" posed to the public treasury or taxpayer and that only those activities which jeopardize state or municipal assets are prohibited. This approach to lending of credit cases also provides that there is no violation of the prohibitions so long as the loan or gift of credit serves a statutory objective to benefit a deserving class of the public.

The constitutional prohibition is intended to do more than merely protect the public treasury. An equally important thrust of the provision is to prohibit private individuals, associations, or corporations from deriving special privileges or advantages from the State or its municipalities. *See Port of Longview v. Taxpayers,* 85 Wn.2d 216, 533 P.2d 128 (1974).

I am opposed to the "risk of loss" analysis for the same reasons set forth in the dissent in *Housing Fin.* and will not

further reiterate them here. The instant action simply does not call upon this court to apply the "risk of loss" approach.

To analyze the present controversy correctly, this court need only determine that there is adequate consideration in exchange for the service credit and employer contributions to the retirement system. The existence of ample consideration negates the City's allegation that the scheme constitutes an unconstitutional gift or loan of the City's credit.

As the majority opinion recognizes, there is abundant consideration for the challenged payment of money by the City to the State. The required contribution by the City is not voluntary in any sense. The contribution is compelled by statute and is merely one of several legal obligations the City assumed when it elected to join the Public Employees' Retirement System (PERS) as a participating employer instead of attempting to operate its own pension system for city employees. *See* RCW 41.40.080, .350, .361, .370, .410. In return for the City's assumption of these legal obligations, the State gave consideration to the City by assuming the legal obligation to admit present and future city employees to membership in PERS and to pay those employees benefits according to the provisions of RCW 41.40. Once the City's employees become members of PERS, the provisions of RCW 41.40, including the promise of service credit contained in RCW 41.40.160(2), become part of their contract of employment. Payment of additional employer contributions pursuant to RCW 41.40.160(2) is only one component of a broad agreement between the State and the City which is supported by consideration on both sides. The State did not compel the City to purchase Cedarcrest Golf Course or to put the course's employees on the city payroll. Having done both, however, the City became legally obligated under its previous agreement with the State to pay the employer's contribution required by RCW 41.40.160(2).

The obvious purpose behind RCW 41.40.160(2) is to encourage existing employees of private enterprises to stay on if offered employment by an acquiring public agency.

The Legislature apparently took note of the general tendency of employees to terminate their service upon a change of ownership of a business. It also undoubtedly recognized that a widespread and sudden loss of key experienced personnel can have devastating consequences for any organization. To help acquiring public agencies retain trained personnel, the Legislature enacted RCW 41.40-.160(2). Its purpose was not to grant additional compensation for *past* service to private employers but instead to offer additional compensation for *future* service to public employers.

In *Aldrich v. State Employees' Retirement Sys.*, 49 Wn.2d 831, 307 P.2d 270 (1957), this court construed a former version of RCW 41.40.010(10) to require the granting of PERS service credit for a nearly 5-year period of service rendered to the federal government before the employee in question became eligible to participate in PERS. The trial court in *Aldrich* had concluded that to allow the employee to receive PERS credit for such service in the calculation of his retirement allowance, when the employee was already receiving a benefit for the same period under the federal Civil Service Retirement System, would be a gratuity and would violate Const. art. 2, § 25 and Const. art. 8, § 7. This court rejected that theory on the basis of the reasoning in *Bakenhus v. Seattle,* 48 Wn.2d 695, 296 P.2d 536 (1956), in which we stated:

> In this state, a pension granted to a public employee is not a gratuity but is deferred compensation for services rendered. The contractual nature of the obligation to pay a pension when the employee has fulfilled all of the prescribed conditions was recognized in *Luellen v. Aberdeen,* 20 Wn. (2d) 594, 148 P. (2d) 849 (1944), in *Benedict v. Board of Police Pension Fund Com'rs,* 35 Wn. (2d) 465, 214 P. (2d) 171, 27 A. L. R. (2d) 992 (1950), and in *Ayers v. Tacoma,* 6 Wn. (2d) 545, 108 P. (2d) 348 (1940). Had we held in those cases, or were we to hold now, that the pension statutes provide for the payment of gratuities, we would be bound to hold further that such statutes are contrary to the provisions of Art.

II, § 25, and Art. VIII, § 7, of the Washington constitution and are therefore void.

*Bakenhus,* at 698. We held in *Aldrich* that the service credit here in issue would not be gratuitous as long as state employment under the PERS statute followed the period for which the employee was granted the prior service credit:

> *Prior service credit* for services antedating the effective date of the state employees' retirement act cannot, standing alone, support a pension under the rule of the *Bakenhus* case. There must be, in addition thereto, some service rendered after the effective date of the act, so that the act will constitute a part of the contract governing the subsequent employment. Then the pensions provided for under the act constitute deferred compensation for the subsequent service and are not gratuities predicated merely upon the prior service.

*Aldrich,* at 833–34. *See also Johnson v. Aberdeen,* 14 Wn. App. 545, 544 P.2d 93 (1975).

Following the reasoning of *Aldrich,* there is no violation of Const. art. 8, § 7, prohibiting a gift or loan of the City's credit. The analysis employed here follows our long–standing approach to lending of credit cases and simply does not require any discussion of the ill conceived "risk of loss" approach.

CONCLUSION

I concur in the result reached by the majority simply because I find that there existed adequate consideration for the prior service credit and employer contributions.