[No. 46554. En Banc. January 31, 1980.]

WASHINGTON HEALTH CARE FACILITIES AUTHORITY, *Petitioner,* v. DIXY LEE RAY, *Respondent.*

*Riddell, Williams, Ivie, Bullitt & Walkinshaw,* for petitioner.

*Slade Gorton, Attorney General,* and *Philip H. Austin, Deputy,* for respondent.

UTTER, C.J.—The Washington Health Care Facilities Authority (Authority) brings this original mandamus action, pursuant to RAP 16.2, to compel the Honorable Dixy Lee Ray, Governor of the State of Washington, to perform her duties as chairman of the Authority. She has refused to do so, asserting that an exercise of those duties would violate the constitution of the State of Washington. We hold that although the challenged actions would be loans of credit, they are exempt from the prohibitions of article 8, section 5 as permissible aid to the infirm.

The Authority was created by Laws of 1974, 1st Ex. Sess., ch. 147, now codified as RCW 70.37. The legislature set forth the purpose and goals of the Authority in RCW 70.37.010:

> The good health of the people of our state is a most important public concern. The state has a direct interest in seeing to it that health care facilities adequate for good public health are established and maintained in sufficient numbers and in proper locations. The rising costs of care of the infirm constitute a grave challenge not only to health care providers but to our state and the people of our state who will seek such care. It is hereby declared to be the public policy of the state of Washington to assist and encourage the building, providing and utilization of modern, well equipped and reasonably priced health care facilities, and the improvement, expansion and modernization of health care facilities in a manner that will minimize the capital costs of construction, financing and use thereof and thereby the costs to the public of the use of such facilities, and to contribute to improving the quality of health care available to our citizens. In order to accomplish these and related purposes this chapter is adopted and shall be liberally construed to carry out its purposes and objects.

The Authority has several statutorily authorized methods it can use to achieve the stated goals, including, but not limited to the issuance of bonds for the construction, purchase, rental, leasing, financing, and refunding of health care projects. RCW 70.37.040. The legislature requires that the bonds be payable only from the special funds created by the Authority for their payment and that they be neither obligations of the State nor general obligations of the Authority. RCW 70.37.040.

This action concerns two attempts by the Authority, Resolutions 79–1 and 79–2, to issue tax–exempt revenue bonds. Both resolutions are dated September 12, 1979. Resolution 79–1 of the Authority provides for the acceptance of the application of Yakima Valley Memorial Hospital for financial assistance in building new hospital facilities and remodeling existing facilities. Under the proposal, the Authority would issue $4 million in revenue bonds, with a projected savings of $2.26 million due to the tax–exempt character of the financing. Resolution 79–2 adopted by the Authority provides for the acceptance of the application of Tacoma General Hospital for financial assistance in refunding its existing high interest rate debt. The Authority would issue approximately $13 million in revenue bonds for this purpose, with a projected savings of $1.4 million due to the tax–exempt character of the financing.

The process for issuing the bonds is complex. First the Authority investigates the need for and the feasibility of the financing requested. If it decides favorably on the application, it adopts a bond resolution authorizing the issuance of bonds. The feasibility of the health care facility generating sufficient revenue to support the debt service on the bonds may also be determined prior to the sale of the bonds. The fees and cost of any underwriters, financial consultants, bond counsel, or other experts involved in the process are paid from the bond proceeds.

The bonds provide that although issued in the name of the Authority, they are not obligations of the State of Washington or general obligations of the Authority but are

payable only from special funds created by the Authority for their payment. They contain a recital on their face that funds for their payment are to be derived solely from revenues received from the operation of the health care facility for which they are being issued. To permit the interest of the bonds to qualify as tax exempt, however, the Authority serves as issuer. The makes the bonds pro forma an "obligation" of the Authority in order to satisfy Internal Revenue Code section 103. In substance, neither the Authority nor the State is obligated. Because the interest on the bonds is tax exempt, the bonds can be sold bearing a lower rate of interest than if the interest were not tax exempt. The savings in interest cost are passed on to the patients of the applicant health care facility.

In the transactions before the court, the bond proceeds are neither State nor Authority monies in the sense that the bond proceeds are not placed in a State or Authority account but are paid to a trustee who places them in special funds according to the particular project for which they were issued and sold. At all times, all proceeds from the sale of the bonds are segregated from other funds of the Authority, the trustee, and the State.

Once the project is accomplished (either new construction occurs or the refunding of old debt bonds is completed), debt service must be paid on the bonds authorized by the Authority. Monies for debt service purposes come solely from the health care facility for whose benefit the bonds were issued and the bonds are secured solely by the revenue stream of the facility and, if necessary, by a mortgage on the facility's property. Monies paid by the health care facility for debt service on the bonds are not deposited with or given to the Authority or to the State but are deposited in the bond fund managed by the trustee and do not constitute funds of the Authority or of the State. The trustee pays all debt service on the bonds from the bond fund.

Thus, a bondholder's remedies are quite limited. The act, the resolutions authorizing the bonds, and the bonds now

before the court all state that the bonds are neither general nor special obligations of the State nor general obligations of the Authority. No bondholder has the right to require the State or the Authority, at any time or under any circumstances, to levy any tax or expend any of its funds for the payment of the principal of or interest on the bonds. Rather, the bonds are secured solely by a first prior lien and charge against net revenues of the respective health care facility and sometimes by a mortgage on the facility's property as well.

Even though these elaborate precautions have been taken to avoid any reliance on the credit, solvency, good name, or moral obligation of the Authority or the State, the Governor contends that the proposed issuance of the bonds would in fact constitute a loan of credit in violation of article 8, section 5 or section 7. Article 8, section 5 of the Washington Constitution provides:

> The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation.

Article 8, section 7 of the Washington Constitution provides:

> No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit to or in aid of any individual, association, company or corporation, except for the necessary support of the poor and infirm, or become directly or indirectly the owner of any stock in or bonds of any association, company or corporation.

In *Port of Longview v. Taxpayers,* 85 Wn.2d 216, 533 P.2d 128 (1974), we invalidated a statutory scheme under which political subdivisions of the state were authorized to issue tax–exempt, nonrecourse, industrial revenue bonds in the name of the municipality, sufficient to cover acquisition, construction, and installation of pollution control devices for private corporations. The challenged transactions took the form of purchases by the municipal corporations of leasehold interests in the pollution control facilities for

sums equal to the proceeds from the sale of the bonds, together with simultaneous subleases of the facilities to the private corporations for periodic rental payments. Stripped of all the lease–sublease terminology, the municipalities were simply borrowing money in their own names in the form of municipal bond issues and loaning that same money to private corporations.

Our holding in *Port of Longview* that the bonding schemes violated article 8, section 7, follows the minority view that nonrecourse development bonding schemes, unless otherwise exempted, constitute loans of credit. *See, e.g., State ex rel. Beck v. York,* 164 Neb. 223, 82 N.W.2d 269 (1957); *State ex rel. Saxbe v. Brand,* 176 Ohio St. 44, 197 N.E.2d 328 (1964).[1] The majority of other jurisdictions have held that nonrecourse revenue bonding schemes are not loans of credit. For a discussion of the majority position, *see,* Recent Developments, *State Constitution—Debt Limitations—Municipality's Issuance of Revenue Bonds to Finance Private Pollution Control Facilities Violates State Constitution,* 50 Wash. L. Rev. 440, 447–49 (1975). We believe that some of the decisions from jurisdictions following the majority approach can be distinguished from the present case on the basis of differences in the constitutional provisions involved. We disagree, however, with the reasoning by which the conclusion is reached in others, that there is no lending of credit without the incurring of new and actual financial liability.

The underlying rationale of the minority view and that of this court is that a state or municipal corporation lends its credit whenever it allows its unique governmental status or

---

[1]Strict interpretations of constitutional provisions prohibiting governmental loans of credit have frequently been followed by constitutional amendments. *See, e.g.,* Neb. Const. art. 13, § 2; Ohio Const. art. 8, § 13. These amendments allow otherwise prohibited loans of credit in order to provide financial assistance for industrial development that will in turn create new employment. Such encouragement of private industry is obviously considered by the voters of those states as being for a public purpose.

authority to be utilized for the purpose of enabling a private corporation or individual to obtain property or money that it could not otherwise acquire for the same price. A state or municipality can "lend its credit" without incurring any actual indebtedness.

The Nebraska Supreme Court adopted this position in *State ex rel. Beck v. York*, 164 Neb. 223, 82 N.W.2d 269 (1957), where the court, under constitutional provisions similar to article 8, sections 5 and 7 of the Washington Constitution, invalidated a scheme to finance a private building with revenue bonds. The Nebraska court stated, at page 227:

> It seems clear to us that the revenue bonds are issued by the city in its own name to give them a marketability and value which they would otherwise not possess. If their issuance by the city is an inducement to industry, some benefits must be conferred, or it would be no inducement at all. Such benefits, whatever form they may take, necessarily must be based on the credit of the city. The loan of its name by a city to bring about a benefit to a private project, even though general liability does not exist, is nothing short of a loan of its credit.

Here, the credit that would be loaned would stem from the unique ability of a public agency, under the Internal Revenue Code, to borrow money at a lower rate of interest than would otherwise have to be paid by a private party. The Authority's challenged actions involve loans of credit inasmuch as the Authority's issuance of the bonds would enable privately owned health care facilities to obtain benefits which they could not otherwise obtain.

This strict interpretation of the lending of credit provision is consistent with our earlier holdings. The people of this state have not amended the constitution to disclaim our broad interpretation of the lending of credit prohibitions. Rather, they have chosen to carve out only two constitutional exceptions. Amendment 45 (article 8, section 8) was adopted in 1966 in response to *State ex rel. O'Connell v. Port of Seattle*, 65 Wn.2d 801, 399 P.2d 623 (1965). More recently, voters ratified amendment 70 (article 8, section

10), in apparent anticipation of an unfavorable holding if an action were brought challenging public utility loans for energy conservation purposes as unconstitutional loans of credit. As we stated in *Port of Seattle,* at page 806:

> If Article 8, § 7, is too restrictive in its terms, that is a matter for the citizens of this state to correct through the amendatory process. It is not for this court to engraft an exception where none is expressed in the constitutional provision, no matter how desirable or expedient such an exception might seem.

▆ Petitioner argues, however, that even if the statutory scheme provides for an otherwise prohibited loan of credit, the Authority is a state agency, and as such it may provide necessary aid to the "infirm" under the constitutionally recognized exception to the prohibition of article 8, section 5. We agree. Section 5 of article 8 applies when the State or agents of the State lend its credit to corporations. The Authority is a state agency because it derives its powers and duties directly from legislative enactments, and because its powers and duties were granted to accomplish state objectives. *Mercy v. Seattle,* 71 Wn.2d 556, 429 P.2d 917 (1967); RCW 70.37.

▆ When article 8 was drafted, local governments were looked to as the appropriate source for welfare relief. In the wake of the Depression and consistent with the national trend, the state legislature shifted the responsibility for welfare relief to the State from the traditionally local arena. Shortly thereafter, this court carved out an exception to article 8, section 5, parallel to that found in the language of article 8, section 7. *Morgan v. Department of Social Security,* 14 Wn.2d 156, 127 P.2d 686 (1942). Although section 5 does not contain an express exception for "the necessary support of the poor and infirm", we have construed sections 5 and 7 as containing similar restrictions, similar exceptions thereto, and as implementing nearly identical policies with respect to different political entities.

*Morgan* established that there is no violation of article 8, section 5 when the State engages in relief measures for the

poor without also requiring them to be infirm. In *Morgan* we held that state aid to the able–bodied poor was not a violation of article 8, section 5. The converse of the proposition in *Morgan* follows, *i.e.*, state aid to the financially able infirm is permissible. For example, it is only reasonable that our emergency medic units go to the aid of all persons in need of immediate medical attention without first inquiring as to their financial ability. To require that the infirm also be needy before they could receive any sort of assistance from the state or a municipality would be absurd in our opinion. The "poor and infirm" exception should be read in the disjunctive.

Although Resolutions 79–1 and 79–2 of the Authority involve loans of the state's credit under article 8, section 5, such loans are *constitutional.* They provide some relief from the rapidly increasing costs of health care to the "infirm" of the state and are thus exempt from the prohibitions of article 8, section 5.

ROSELLINI, WRIGHT, and HOROWITZ, JJ., concur.
WILLIAMS, J., concurs in the result.

DOLLIVER, J. (concurring)—I agree with the result reached by the majority. However, I prefer to hold the issuance of these tax–exempt, no–recourse, revenue bonds not to be a violation of Const. art. 8, § 5. The overwhelming majority of jurisdictions which have provisions similar to article 8, section 5, hold this type of transaction not to be contrary to their constitutions. As I read this provision of the constitution, it is *not violated* by Laws of 1974, 1st Ex. Sess., ch. 147, p. 503; RCW 70.37. If, however, some of our previous opinions seem to require an invalidation (*see Port of Longview v. Taxpayers,* 85 Wn.2d 216, 533 P.2d 128 (1974)), either these cases should be distinguished or, if necessary, overruled. *See* Note, 50 Wash. L. Rev. 440 (1975).

Certainly this seems a more straightforward way of validating the issuance of the bonds as compared with the convoluted analysis of the majority which declares a conjunctive to be a disjunctive and judicially transmutes language found exclusively in one section of the constitution to another.

STAFFORD, BRACHTENBACH, and HICKS, JJ., concur with DOLLIVER, J.