[No. 47449-4. En Banc. September 17, 1981.]

THE WASHINGTON HEALTH CARE FACILITIES AUTHORITY, *Petitioner*, v. JOHN SPELLMAN, *as Governor*, ET AL, *Respondents*.

*Riddell, Williams, Ivie, Bullitt & Walkinshaw,* by *Walter Walkinshaw* and *Stimson Bullitt,* for petitioner.

*Kenneth O. Eikenberry, Attorney General,* and *Philip H. Austin, Deputy,* for respondents.

*J. Stuart Showalter* and *Lawrence B. McNerthney* on behalf of the Catholic Health Association and *Robert J. Walerius* and *Pamela O. Okano* on behalf of the Washington State Hospital Association, amici curiae for petitioner.

DOLLIVER, J.—In 1974, the legislature enacted the health care facilities act to provide tax exempt capital financing for nonprofit health care facilities. RCW 70.37. The Washington Health Care Facilities Authority, created under that act to implement its purposes, consists of five members: the Governor, Lieutenant Governor, Insurance Commissioner, the chairman of the Washington State Hospital Commission, and a fifth member appointed to the Authority by the Governor from the general public and subject to confirmation by the Senate. By statute, the chairman of the Authority is the Governor. RCW 70.37.030. The secretary of the Authority, who is elected to the position by the mem-

bers, is Insurance Commissioner Richard Marquardt.

The purposes of the Authority are stated in RCW 70.37-.010:

> The good health of the people of our state is a most important public concern. The state has a direct interest in seeing to it that health care facilities adequate for good public health are established and maintained in sufficient numbers and in proper locations. The rising costs of care of the infirm constitute a grave challenge not only to health care providers but to our state and the people of our state who will seek such care. It is hereby declared to be the public policy of the state of Washington to assist and encourage the building, providing and utilization of modern, well equipped and reasonably priced health care facilities, and the improvement, expansion and modernization of health care facilities in a manner that will minimize the capital costs of construction, financing and use thereof and thereby the costs to the public of the use of such facilities, and to contribute to improving the quality of health care available to our citizens. In order to accomplish these and related purposes this chapter is adopted and shall be liberally construed to carry out its purposes and objects.

To achieve these purposes, the Authority is

> empowered to issue bonds for the construction, purchase, acquisition, rental, leasing or use by participants of projects for which bonds to provide funds therefor have been approved by the authority.

RCW 70.37.040(1). It may issue special fund bonds to

> refund already existing mortgages or other obligations on health care facilities already constructed and operating . . .

RCW 70.37.040(4).

> The authority may also lease to participants, lease to them with option to purchase, sell to them, facilities which it has acquired by construction, purchase, devise, gift, or leasing . . .

RCW 70.37.040(5).

If the Authority decides to accept an application, it adopts a bond resolution. WAC 247–16–070(2). This approves the application and authorizes the issuance of

bonds to enable the financial assistance requested. Next, the chairman and secretary sign the resolution. Authority and applicant enter a loan agreement pursuant to the Authority's rules. WAC 247–16–080(1). Thereafter, the practice is for the bonds to be sold to underwriters who then market the bonds to interested investors.

Four corporations that own and operate hospitals and that are, in varying degrees, affiliated with religious organizations have applied to the Authority for financial assistance for health care facilities projects. The Authority investigated the applicants, found they had satisfied all of the conditions prescribed by it, and adopted resolutions declaring its decision to grant assistance to each of them.

The chairman and secretary, defendants herein, challenged the constitutionality of the act on the ground that it violated the federal and state constitutional provisions concerning the relationship between church and state. For this reason they refused to sign the bond resolutions. Thereafter, pursuant to Const. art. 4, § 4, plaintiff petitioned this court for an alternative writ of mandamus to require defendants to sign the bond resolutions.

Defendants concede the financing proposal violates neither Const. art. 9, § 4, or the establishment clause of the first amendment to the United States Constitution. Their sole claim is that it violates Const. art. 1, § 11. That provision reads, in material part:

> No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment . . .

As is immediately apparent, this provision raises two issues: (1) Is "public money or property" involved? and (2) If so, is it to be "appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment"? Since we hold no public money or property is involved, we need not pass on the religious question in issue (2).

In our recent case of *Washington Health Care Facilities Auth. v. Ray*, 93 Wn.2d 108, 605 P.2d 1260 (1980), the same

statute (RCW 70.37) was before the court. In that case, RCW 70.37 was upheld as not violating Const. art. 8, § 5, which prohibits the giving or loaning of the credit of the State to any individual, association, company or corporation. While the constitutional issue in *Washington Health Care Facilities Auth. v. Ray, supra,* differs from the issue before us, the analysis by the court in the earlier case of the process for issuing the bonds is applicable to this case.

In contending that no public moneys or property are involved in this case, plaintiff makes five arguments which we find persuasive:

1. *No money comes from the public treasury.*

Both parties agree the act provides that no funds of the State may be used in defraying the expenses of the Authority in carrying out the purposes of the act. RCW 70.37.090 states:

> The authority shall have power to require persons applying for its assistance in connection with the investigation and financing of projects to pay fees and charges to provide the authority with funds for investigation, financial feasibility studies, expenses of issuance and sale of bonds and other charges for services provided by the authority in connection with such projects. All other expenses of the authority including compensation of its employees and consultants, expenses of administration and conduct of its work and business and other expenses shall be paid out of such fees and charges, out of contributions and grants to it, out of the proceeds of bonds issued for projects of participants or out of revenues of such projects; *none by the state of Washington.* The authority shall have power to establish special funds into which such money shall be received and out of which it may be disbursed by the persons and with the procedure and in the manner established by the authority.

(Italics ours.)

Since no Authority expenses may be paid with state funds, these hospitals are not even aided *indirectly* by public money. (This is in marked contrast to the scheme under the State Higher Education Assistance Authority; *see*

*State Higher Educ. Assistance Auth. v. Graham,* 84 Wn.2d 813, 816, 529 P.2d 1051 (1974)).

The only "public" financial assistance given borrower hospitals here is indirect, not measurable in dollars, and is not state aid: Those who receive the interest from tax exempt bonds are relieved of the obligation to pay a tax on this income. This tax relief can hardly be called an appropriation or application of public money unless the income which is taxed is claimed to be public money in the first place. This we refuse to do.

Furthermore, even arguing the exemption represents some sort of financial support to a taxpayer, its source is the federal treasury. The reasonable meaning of "public money" in article 1, section 11 is money from the treasury of this state or its municipalities, not some other governmental exchequer.

Defendant contends that the ability given to the hospitals to borrow money at a lower than normal rate of interest because of the tax exempt status of that interest is somehow "property" under Const. art. 1, § 11. No citation other than *York v. Stone,* 178 Wash. 280, 285, 34 P.2d 911 (1934), is given in support of this proposition. That case held a right of occupancy of real estate did constitute property and that the term "property" embraced "every interest or estate which the law regards of sufficient value for judicial recognition." We do not find this definition to be particularly useful in this case.

While the hospitals do receive something of value under the act, no property is "appropriated or applied to" anyone by the Authority. The State gives nothing but its blessing; it passes its conceptual hands over the bonds to permit a favored federal tax treatment.

> [T]he bonds are neither general nor special obligations of the State nor general obligations of the Authority. No bondholder has the right to require the State or the Authority, at any time or under any circumstances, to levy any tax or expend any of its funds for the payment of the principal of or interest on the bonds. Rather, the

bonds are secured solely by a first prior lien and charge against net revenues of the respective health care facility and sometimes by a mortgage on the facility's property as well.

. . . [T]hese elaborate precautions have been taken to avoid any reliance on the credit, solvency, good name, or moral obligation of the Authority or the State . . .

*Washington Health Care Facilities Auth. v. Ray, supra* at 112.

   2. *The bond proceeds never enter the public treasury.*

As was stated in *Washington Health Care Facilities Auth. v. Ray, supra* at 111:

In the transactions before the court, the bond proceeds are neither State nor Authority monies [RCW 70.37.080] in the sense that the bond proceeds are not placed in a State or Authority account but are paid to a trustee who places them in special funds according to the particular project for which they were issued and sold. At all times, all proceeds from the sale of the bonds are segregated from other funds of the Authority, the trustee, and the State.

   3. *Repayments of the bonds do not pass through the public treasury.*

The bond repayment moneys from the hospitals "shall not be or constitute funds of the state of Washington". RCW 70.37.070.

Monies for debt service purposes come solely from the health care facility for whose benefit the bonds were issued and the bonds are secured solely by the revenue stream of the facility and, if necessary, by a mortgage on the facility's property. Monies paid by the health care facility for debt service on the bonds are not deposited with or given to the Authority or to the State but are deposited in the bond fund managed by the trustee and do not constitute funds of the Authority or of the State. The trustee pays all debt service on the bonds from the bond fund.

*Washington Health Care Facilities Auth. v. Ray, supra* at

111.

> 4. *The bonds are not state debts.*

The bonds provide that although issued in the name of the Authority, they are not obligations of the State of Washington or general obligations of the Authority [RCW 70.37.040(1), (5)] but are payable only from special funds created by the Authority for their payment. They contain a recital on their face that funds for their payment are to be derived solely from revenues received from the operation of the health care facility for which they are being issued. . . . In substance, neither the Authority nor the State is obligated.

*Washington Health Care Facilities Auth. v. Ray, supra* at 110–11.

> 5. *Although bond sales are enabled by a public body, the money is not acquired either for or from the general public.*

While the bond proceeds do come from the sale of bonds under the name of the Authority, which is a public body (RCW 70.37.030) this does not make the proceeds "public money".

█ The Authority does not dispense the money to or for the public. It all goes to the hospitals. Nor does the Authority obtain the money *from* the public. It does not obtain it (1) by taxation (RCW 70.37.040 and .100); (2) from another unit of government; (3) by borrowing on the promise of repayment from taxation; (4) by incurring obligations on behalf of the State (RCW 70.37.100); or (5) by selling the bonds to the State. The bonds are not state investments. Rather, the Authority obtains the money from a sale of the bonds to private underwriters, who in turn resell to investors. (This is in vivid contrast to the statutory scheme of the State Higher Education Assistance Authority; *see State Higher Educ. Assistance Auth. v. Graham, supra* at 816.)

These are tax exempt nonrecourse revenue bonds. We are aware of no previous case in Washington which has con-

strued this provision of article 1, section 11, nor a case from another state which has the same constitutional language. This is not the same situation as in *Port of Longview v. Taxpayers,* 85 Wn.2d 216, 533 P.2d 128 (1974), where as we succinctly said in *Washington Health Care Facilities Auth. v. Ray, supra* at 113, "[T]he municipalities were simply borrowing money in their own names in the form of municipal bond issues and loaning that same money to private corporations." A totally different method of financing is provided by RCW 70.37.

While we have always been vigilant to prevent the unconstitutional use of public funds for sectarian purposes (*see, e.g., State Higher Educ. Assistance Auth. v. Graham, supra; Weiss v. Bruno,* 82 Wn.2d 199, 509 P.2d 973 (1973)), where, as here, there are no public funds or property being appropriated or used, and thus no constitutional infirmity, we believe the legislation, if unchallenged on other grounds, should be upheld.

The writ of mandamus shall issue; the defendants are ordered to sign the bond resolutions.

BRACHTENBACH, C.J., and STAFFORD, UTTER, HICKS, DORE, and DIMMICK, JJ., concur.

ROSELLINI, J. (concurring in the result)—I concur in the result only because I believe that everyone is entitled to good medical services at the lowest possible cost.

I am concerned that the hiring practices of two of the recipients give priority to members of a religious faith. This gives to that particular religious faith an indirect benefit that may be questionable under equal employment opportunity laws. I trust some other public body which investigates such hiring practices will intercede to require compliance with those laws.

WILLIAMS, J., concurs with ROSELLINI, J.