[No. 50931-0.   En Banc.   May 23, 1985.]

THE HIGHER EDUCATION FACILITIES AUTHORITY,
*Petitioner,* v. BOOTH GARDNER,
*as Governor,* ET AL,
*Respondents.*

---

[16]*See Kramer,* at 394.

[17]*See Hogenson,* at 218. *See also Johnson,* at 617–18.

*Riddell, Williams, Bullitt & Walkinshaw,* by *Stimson Bullitt* and *Nyle G. Barnes,* for petitioner.

*Kenneth O. Eikenberry, Attorney General,* and *Philip H. Austin, Senior Deputy,* for respondents.

DOLLIVER, C.J.—This case was brought as a petition for a writ of mandamus, Const. art. 4, § 4, asking this court to require the Governor and Lieutenant Governor to show cause why they should not sign resolutions 84–1 and 84–2,

issuing bonds in the name of the Washington Higher Education Facilities Authority. We accepted jurisdiction pursuant to RAP 16.2(d) upon an adequate agreed statement of facts signed by the parties.

The issues before the court involve the constitutionality of bonds to be issued under RCW 28B.07, Washington Higher Education Facilities Authority—private nonprofit educational institutions act (WHEFA). The act enables participants to benefit from the federal tax exempt status of state issued bonds. Recipients of the bond proceeds in question are Seattle University and Pacific Lutheran University (PLU). Both are universities with ties to religious institutions. We conclude, however, that under the safeguards of the statutory scheme, these proposed bonds do not violate our state constitution.

WHEFA states that nonprofit higher education institutions are a necessary and valuable part of the state's higher education resources, providing diversity, choice and greater accessibility to the state's students. In order to accomplish the stated public purpose of enabling higher education institutions to build and improve their facilities, the act authorizes the issuance of special obligation bonds. These bonds may be issued for the benefit of any participants, but participants thus benefited must bear the costs of repayment. RCW 28B.07.050. Neither the State nor any subdivision is obligated on the bonds. RCW 28B.07.060.

A participant is a higher education institution which finances or refinances a project under this act. RCW 28B.07.020(5). A higher education institution is described as

> a private, nonprofit educational institution, the main campus of which is permanently situated in the state, which is open to residents of the state, which neither restricts entry on racial or religious grounds, which provides programs of education beyond high school leading at least to the baccalaureate degree, and which is accredited by the Northwest Association of Schools and Colleges or by an accrediting association recognized by the council for postsecondary education.

RCW 28B.07.020(4).

The act sets up a 7-member Authority, including the Governor, Lieutenant Governor, the executive coordinator of the state council for postsecondary education, and four public members. RCW 28B.07.030(2).

The following facts are agreed to by the parties: At a meeting September 5, 1984, four members of the Authority voted in favor of resolutions 84-1 and 84-2. Resolution 84-1 approved issuance of revenue bonds in the amount of $11,600,000 for the benefit of Seattle University. Resolution 84-2 approved issuance of revenue bonds in the amount of $10 million to PLU. The bonds were to be issued in the name of the Authority, with a trust fund created from bond proceeds, and the proceeds loaned to Seattle University and PLU.

The resolutions were processed according to the rules of the Authority and consistent with the statutory requirements. The proposed trust indentures bear the requisite disclaimers as to any state obligation or general obligation of the Authority. Further, the indentures provide that each bond will carry the same disclaimer on its face. All debt service shall be paid by the benefited institutions. All funds shall be kept completely separate from other funds of the Authority. In addition, all costs associated with issuance of the bonds are to be borne by the benefited participants. The Authority's general administrative costs are apportioned among all participants, with no cost accruing to the State.

While four members of the Authority voted in favor of the bond resolutions, only two members signed. The act requires all voting members voting yes to sign, RCW 28B-.07.030(5); thus, this petition for an alternative writ of mandamus. Private counsel had advised the Governor and Lieutenant Governor not to sign the resolutions, indicating there might be difficulty marketing the bonds because of possible constitutional questions regarding the religious nature of the institutions to be benefited, and a loan of the State's credit.

Seattle University is conducted under the auspices of the Society of Jesus (Jesuits), an order of the Roman Catholic Church. The university is governed by a Board of Trustees composed of 12 lay persons and 7 Jesuits. The President of Seattle University must be a Jesuit. Students are required to take two courses in theology and religious studies from among a wide variety of courses offered. These required courses are academic in nature.

PLU is governed by a Board of Regents, the majority of whom are either ex officio leaders in the Lutheran Church or elected by divisions within the church. Six at large members are elected at the annual meeting and may be non–Lutherans. PLU requires two courses in religion, but the courses may include non–Christian classes or may be avoided by taking a nontraditional program.

Both institutions intend to apply their bond proceeds to facility improvements. Because the bonds are secured only by obligation of the respective institutions, the anticipated rate of interest reflects each institution's creditworthiness. Estimates of the rate of interest indicate that Seattle University will save $11,037,600 as a result of issuance of the bonds by the Authority. It is estimated PLU would save $9,500,000. These savings result from the difference between anticipated market rates of nontaxable bonds and taxable bonds. Because the Authority is a state agency, its bonds are tax exempt to holders under section 103 of the Internal Revenue Code (I.R.C. § 103 (1982)).

Each institution has agreed to pass the resulting savings on to the students of each institution "in the form of reductions of tuition and fees, foregone increases of tuition and fees, grants–in–aid and/or scholarships . . ." Section 8.11 of Loan and Security Agreement dated September 1, 1984. The institutions have both agreed to refrain from applying the proceeds of the bonds to religious objects or buildings except to the extent permitted by law. Section 5.01(b) of Loan and Security Agreement.

In addition, all costs associated with issuance of the bonds are to be borne by the benefited participants. The

general administrative costs of the Authority are apportioned among all participants. The Authority receives no financial assistance from the State.

Three parts of the Washington Constitution must be examined to determine if they are violated by the authorization of bonds under WHEFA to benefit Seattle University and PLU. (The federal constitution is not in question. *See Hunt v. McNair*, 413 U.S. 734, 37 L. Ed. 2d 923, 93 S. Ct. 2868 (1973) (holding that similar South Carolina bond scheme not violative of the establishment clause, U.S. Const. amend. 1.))

The following constitutional provisions are at issue:

No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment . . .

Const. art. 1, § 11 (amend. 34).

All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.

Const. art. 9, § 4.

The credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation.

Const. art. 8, § 5.

 As we have pointed out on a number of occasions, a party challenging the constitutionality of a statute must demonstrate beyond a reasonable doubt that the statute is invalid and must rebut the presumption that all legally necessary facts exist. *County of Skamania v. State*, 102 Wn.2d 127, 132, 685 P.2d 576 (1984); *In re Marriage of Johnson*, 96 Wn.2d 255, 258, 634 P.2d 877 (1981); *Bellevue v. State*, 92 Wn.2d 717, 720, 600 P.2d 1268 (1979). *But see* Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. Puget Sound L. Rev. 491, 507–08 (1984).

I

The question as to whether the sale of tax exempt non-recourse revenue bonds by the Authority violates Const. art. 1, § 11 (amend. 34) has been answered by our opinion in *State Health Care Facilities Auth. v. Spellman*, 96 Wn.2d 68, 633 P.2d 866 (1981). We determined it did not, finding the use of the State's tax exempt status was neither a conferring of "public money" nor "property" which would run afoul of article 1, section 11 prohibitions.

■ A comparison of the health care facilities act, RCW 70.37 (at issue in *Health Care v. Spellman*), and WHEFA shows they are nearly identical. Our analysis in *Health Care v. Spellman* thus controls. While the private church-related colleges will receive benefits, these benefits are derived through operation of the Internal Revenue Code. These benefits from federal tax exemptions are not "money or property" of the citizens of this state. The State parts with nothing in allowing its tax exempt status to be used by the Authority. Because these federal tax benefits are neither public "money" nor "property", they do not come under the prohibitions of article 1, section 11.

The same reasoning also applies to the prohibitions of article 9, section 4 against the use of "public funds" for schools under "sectarian control or influence." A benefit which is neither public "money" nor "property" is likewise not "public funds", under the contemplation of our constitution. *See Minnesota Higher Educ. Facilities Auth. v. Hawk*, 305 Minn. 97, 107–08, 232 N.W.2d 106, 95 A.L.R.3d 987 (1975) (holding that authorization of similar bonds did not violate Minnesota Constitution prohibitions against expenditures of "public money" for religious education); *California Educ. Facilities Auth. v. Priest*, 12 Cal. 3d 593, 606–07, 526 P.2d 513, 116 Cal. Rptr. 361 (1974) (similar nonrecourse bonds issued under state's authority to benefit higher education institutions not an unconstitutional gift of public money or unconstitutional aid to institutions of higher education).

## II

As to the loan of state credit issue, we also find no constitutional violation.

The court has struggled in prior decisions to reconcile the constitution's "loan of credit" prohibitions with bonding schemes which take advantage of the State's tax exempt status. (Article 8, section 7 applies to municipal corporations the prohibitions of article 8, section 5. The two provisions are generally interpreted in like manner. *See, e.g., In re Marriage of Johnson*, 96 Wn.2d 255, 267, 634 P.2d 877 (1981); *State Health Care Facilities Auth. v. Ray*, 93 Wn.2d 108, 115–16, 605 P.2d 1260 (1980).) We found nonrecourse bonds violative of the constitution in *Port of Longview v. Taxpayers of Port of Longview*, 85 Wn.2d 216, 533 P.2d 128 (1974) (a lease–sublease arrangement for financing pollution control facilities, where the municipalities borrowed money in their own names in the form of municipal bonds and lent the same money to private corporations). More recently, we held such a bond arrangement issued under the aegis of a state authority was permissible. *Health Care v. Ray*. In the latter, however, we premised our holding on the traditional exemption granted to aid the poor and infirm. *Health Care v. Ray*, at 115–16.

In an earlier opinion unrelated to nonrecourse bonds, we addressed section 5 from its historical perspective. *In re Marriage of Johnson, supra*. There, in a case involving the child support enforcement program of the Department of Social and Health Services, we articulated two alternative rationales for exemption from section 5: (1) performance of a recognized public function (collection of child support payments by a state agency, providing an incidental value to private parties); or (2) risk of loss analysis (jeopardy of state funds). In *Johnson*, we noted that risk of loss applied to creation of a public debt, and the term "debt" was used in its traditional "borrower", "lender" sense. That is, the State was prohibited from assuming the liabilities of private parties.

> We believe, therefore, that the prohibition was against loans as used in the ordinary and popular sense, between a lender and a borrower, where a question of the security of funds in such transactions would be involved . . .

*In re Marriage of Johnson,* at 267 (quoting *State ex rel. Graham v. Olympia,* 80 Wn.2d 672, 676–77, 497 P.2d 924 (1972)). *Accord, Seattle & Lk. Wash. Waterway Co. v. Seattle Dock Co.,* 35 Wash. 503, 77 P. 845 (1904).

In our most recent case dealing with nonrecourse bonds, the court found no constitutional defect in the issuance of bonds to finance the purchase of homes. *State Housing Fin. Comm'n v. O'Brien,* 100 Wn.2d 491, 671 P.2d 247 (1983). In *Housing Fin.,* the court did not determine whether the legislation in question involved creation of a public debt. Rather, the court recognized there was a potential danger to the State's credit rating from default, even though the bonds were issued without recourse. In light of the extensive safeguards in the legislation, however, the danger was held to be minimal. Thus, the court simply applied a risk of loss analysis delineated in *In re Marriage of Johnson, supra.* Finding the legislation was both "consistent with the State's legitimate function and that the risk to the state's taxpayers and effectuation of the public purpose remain under public control . . .", we upheld the legislation. *State Housing Fin. Comm'n v. O'Brien, supra* at 500.

██ Some clarification is needed to reconcile the language in these recent opinions. WHEFA can be upheld under the *Housing Fin.* analysis, *i.e.,* higher education is a legitimate state function and the "risk of loss" protections are equal to those in the *Housing Fin.* legislation. We believe, however, the case before us can best be addressed by simply asking whether the bonding scheme constitutes creation of a public debt (credit).

As noted by a commentator who analyzed recent cases before this court:

> The key is not to develop new exceptions to avoid the language of article VIII, sections 5 and 7, such as the

"risk of loss" theory that has appeared in some recent cases, but rather to approach the constitutional language strictly and rigorously, presuming from the outset that proposed actions by legislative bodies are constitutional and placing the burden on those who would challenge the constitutionality of a proposed government action. The court should then insist that each and every element of the applicable provision be present before a prohibition will apply. This approach, a conservative method relying principally on the text of the constitution itself, ultimately may yield more flexibility in practice than will new formulas that may not be easily applied as new situations arise.

(Footnotes omitted.) Spitzer, *An Analytical View of Recent "Lending of Credit" Decisions in Washington State*, 8 U. Puget Sound L. Rev. 195, 197 (1985). Spitzer examined past opinions in light of the separate elements of sections 5 and 7, and found a consistent denial of application when one of the elements was missing. *See, e.g., Louthan v. King Cy.*, 94 Wn.2d 422, 617 P.2d 977 (1980) (gift component missing); *Anderson v. O'Brien*, 84 Wn.2d 64, 524 P.2d 390 (1974) (individual, association, company, or corporation component missing); *State ex rel. Graham v. Olympia, supra* (loan of money component absent); *Gruen v. State Tax Comm'n*, 35 Wn.2d 1, 211 P.2d 651 (1949) (loan of credit component missing), *overruled in State ex rel. State Fin. Comm. v. Martin*, 62 Wn.2d 645, 384 P.2d 833 (1963). Spitzer, at 198 n.17.

Using the same analysis, we can break article 8, section 5 into four components: (1) credit (2) of the state (3) shall not be given or loaned to or used in aid of (4) any individual, association, company or corporation. The State's tax exempt status simply is not credit; article 8, section 5 does not apply.

Although the State's tax exempt status is being utilized by private universities, this does not create a debt. A suretyship is not created, nor is a borrower–lender relationship established between the State and the universities or the bondholders. The State assumes no obligation on the

bonds. The rationale of *Health Care v. Spellman,* which dealt with whether "public money or property" was involved, is applicable to our section 5 analysis here: (1) No money comes from the public treasury. (2) The bond proceeds never enter the public treasury. (3) Repayments of the bonds do not pass through the public treasury. (4) The bonds are not state debts. (5) Although bond sales are enabled by a public body, the money is not acquired either for or from the general public. *Health Care v. Spellman,* at 72–76. The WHEFA bonds are no less protective of the state treasury than the *Health Care* bonds. Since no debt is created, there is no loan of credit, and the bonds are valid. This being so, we need not address the purpose of the bonds or whether other portions of Const. art. 8, §§ 5 and 7 were violated.

In reaching this conclusion, we join the majority of states whose courts have addressed similar provisions in their state constitutions. *See State Constitution—Debt Limitations—Municipality's Issuance of Revenue Bonds To Finance Private Pollution Control Facilities Violates State Constitution—Port of Longview v. Taxpayers of Port of Longview, 84 Wn.2d 475, 527 P.2d 263 (1974),* 50 Wash. L. Rev. 440, 447–49 (1975) (listing state court decisions). *See also Opinions of the Justices,* 354 Mass. 779, 784–85, 236 N.E.2d 523 (1968) (equating constitutional prohibition against loan of credit with "borrowing", and finding no violation in a similar nonrecourse bonding scheme to aid institutions of higher education).

In addressing a nearly identical bonding scheme, the United States Supreme Court made this observation:

The "state aid" involved in this case is of a very special sort. We have here no expenditure of public funds, either by grant or loan, no reimbursement by a State for expenditures made by a parochial school or college, and *no extending or committing of a State's credit.* Rather, the only state aid consists, not of financial assistance directly or indirectly which would implicate public funds or credit, but the creation of an instrumentality (the Authority) through which educational institutions may

borrow funds on the basis of their own credit and the security of their own property upon more favorable interest terms than otherwise would be available. The Supreme Court of New Jersey characterized the assistance rendered an educational institution under an act generally similar to the South Carolina Act as merely being a "governmental service." *Clayton* v. *Kervick,* 56 N. J. 523, 530–531, 267 A. 2d 503, 506–507 (1970). The South Carolina Supreme Court, in the opinion below, described the role of the State as that of a "mere conduit." [*Hunt v. McNair,* 258 S.C. 97, 107, 187 S.E.2d 645, 650 (1972)].

(Italics ours.) *Hunt v. McNair,* 413 U.S. 734, 745 n.7, 37 L. Ed. 2d 923, 93 S. Ct. 2868 (1973).

Bonds authorized under WHEFA do not violate Const. art. 1, § 11 (amend. 34), Const. art. 9, § 4, and Const. art. 8, § 5. The petition for the writ of mandamus is granted.

UTTER, DORE, PEARSON, ANDERSEN, and DURHAM, JJ., concur.

GOODLOE, J. (dissenting)—Because I believe that Const. art. 1, § 11 (amend. 34) and Const. art. 8, § 5 are violated by this legislative scheme, I respectfully dissent.

Const. art. 1, § 11 (amend. 34)

Admittedly, *State Health Care Facilities Auth. v. Spellman,* 96 Wn.2d 68, 633 P.2d 866 (1981) addressed an article 1, section 11 challenge to a similar legislative scheme and found the legislation not to be constitutionally infirm. *Spellman* carefully, and I believe correctly, answered the "money" component of article 1, section 11. However, it gives short shrift to the "property" component.

I believe *Spellman* erred in finding that "property" was not conferred by use of the tax exempt status. With respect to "property", *Spellman* said:

Defendant contends that the ability given to the hospitals to borrow money at a lower than normal rate of interest because of the tax exempt status of that interest is somehow "property" under Const. art. 1, § 11. No citation other than *York v. Stone,* 178 Wash. 280, 285, 34

P.2d 911 (1934), is given in support of this proposition. That case held a right of occupancy of real estate did constitute property and that the term "property" embraced "every interest or estate which the law regards of sufficient value for judicial recognition." We do not find this definition to be particularly useful in this case.

While the hospitals do receive something of value under the act, no property is "appropriated or applied to" anyone by the Authority. The State gives nothing but its blessing; it passes its conceptual hands over the bonds to permit a favored federal tax treatment.

*Spellman,* at 73.

Although *Spellman* did not find the *York v. Stone,* 178 Wash. 280, 34 P.2d 911 (1934) definition of property very helpful, it did not offer its own definition or explain why the government's unique tax exempt status is not "property". Nor does the majority in this case define or explain it. "Property" cannot simply be lumped together with "money". The term "property" was explicitly added by the founding fathers of the Washington State Constitution, after consideration of alternative language referring only to money. *See Journal of the Washington State Constitutional Convention, 1889,* at 499–500 (B. Rosenow ed. 1962).

Surprisingly "property" has only infrequently been defined by this court. The court in *Lee & Eastes, Inc. v. Public Serv. Comm'n,* 52 Wn.2d 701, 704, 328 P.2d 700 (1958), quoting from prior cases, said:

"Property is a word of very broad meaning and when used without qualification may reasonably be construed to include obligations, rights and other intangibles as well as physical things." *Investment & Securities Co. v. Robbins* (1943, E. D. Wash., N. D.), 49 F. Supp. 620 [, 622–23]. And property ". . . is a term of broad significance, embracing everything that has exchangeable value, and every interest or estate which the law regards of sufficient value for judicial recognition." *York v. Stone,* (1934), 178 Wash. 280, [285,] 34 P. (2d) 911; *Washington Fruit & Produce Co. v. Yakima* (1940), 3 Wn. (2d) 152, 100 P. (2d) 8, 128 A. L. R. 159.

I find this definition is useful. Tax exempt status fits within

this definition because tax exempt status can be classified as either a right or an intangible, which has sufficient value and is judicially recognized.

This public property will be applied for the support of religious establishments and therefore is unconstitutional under article 1, section 11.

Const. art. 8, § 5

The majority opinion states that the court has "struggled" in prior decisions addressing the constitutional prohibition against "loan of credit". Majority opinion, at 845. "Struggle" is a nice term for what can only be accurately described as "jumping all over the board".

In *State Health Care Facilities Auth. v. Ray,* 93 Wn.2d 108, 605 P.2d 1260 (1980), the court addressed an article 8, section 5 challenge to the legislation reviewed in *Spellman. Ray* recognized the tax exempt revenue bonds as "loans of credit". *Ray,* at 109.

> [A] state or municipal corporation *lends its credit* whenever it allows *its unique governmental status* or authority to be utilized for the purpose of enabling a private corporation or individual to obtain property or money that it could not otherwise acquire for the same price. A state or municipality can "lend its credit" without incurring any actual indebtedness.
>
> . . .
>
> Here, the credit that would be loaned would stem from the unique ability of a public agency, under the Internal Revenue Code, to borrow money at a lower rate of interest than would otherwise have to be paid by a private party.

(Italics mine.) *Ray,* at 113–14.

Despite this determination, *Ray* was able to find the involved bonds constitutional by incorporating the Const. art. 8, § 7 "poor and infirm" exception into Const. art. 8, § 5.

In a later case, *State Housing Fin. Comm'n v. O'Brien,* 100 Wn.2d 491, 671 P.2d 247 (1983), the court, examining a similar bond scheme under loan of credit analysis, announced that state status and state liability are compo-

nents of "state credit", relying on *In re Marriage of Johnson,* 96 Wn.2d 255, 634 P.2d 877 (1981), a plurality decision not involving tax exempt revenue bonds.

*O'Brien* stated: "Certainly, the lending of credit clause was not intended to insulate taxpayers from all risk and debt accruing from the public decisions of their governing representatives." *O'Brien,* at 495. I believe the lending of credit clause was meant to prohibit lending of the State's credit, regardless of the risk involved. The *O'Brien* statement that presence of safeguards makes loans of credit permissible, *O'Brien,* at 495, flies directly in the face of the clear, unambiguous constitutional language of article 8, section 5: "The credit of the state shall not, in any manner be given or loaned to . . ."

To allow the constitutional mandate against "lending of credit" to be abrogated by finding that a "state concern" is involved if there are sufficient safeguards is to judicially declare the death knell for the mandate. Many worthy areas of state concern exist and many of these would be benefited by a grant of the State's unique tax exempt status and blessing. However, no state concern can be furthered at the expense and demise of a constitutional mandate, absent constitutional amendment.

However, it is not necessary to overrule *O'Brien* as that opinion is liberally sprinkled with "needy" language to find that it, like *Ray,* falls within the "needy and infirm" exception. *O'Brien,* at 496–98.

The majority in this case says: "The State's tax exempt status simply is not credit". Majority opinion, at 847. It does not discuss, distinguish, or explain the language in *Ray.*

I believe *Ray* was correct in its characterization of tax exempt status as a loan of credit, and, because these bonds are not within the needy and infirm exception, I would hold that article 8, section 5 is violated.

BRACHTENBACH and CALLOW, JJ., concur with GOODLOE, J.