Honorable Steve E. Kolodney Director, Department of Information Services P.O. Box 42445 Olympia, Washington 98504-2445
Dear Director Kolodney:
By letter earlier acknowledged you have asked for an opinion on two questions related to the implementation of the Education Technology Act, codified as chapter 28D.02 RCW. Your questions are posed on behalf of the K-20 Telecommunications Oversight and Policy Committee established in RCW 28D.02.010.
Chapter 28D.02 RCW was enacted by the Legislature in 1996. Laws of 1996, ch. 137. In it, the Legislature ". . . supports the creation of a K-20 education network for the coordinated expansion of current technology and the development of new technologies that support an integrated and interoperable educational technology network serving kindergarten through higher education and promoting access for Washington citizens." RCW 28D.02.005. Your committee was established to plan and coordinate the development of the education network. RCW 28D.02.010. One of the committee's main tasks is to identify existing hardware which can be utilized in developing the network, as well as to identify and plan for the acquisition of additional facilities. RCW 28D.02.020.
One of the statutory purposes of the network is to ". . . foster partnerships among public, private, and non-profit entities, including independent non-profit baccalaureate institutions of higher education, libraries, and public hospitals. . . ." RCW 28D.02.020(5). RCW 28D.02.070 establishes a two-phase plan. Phase one would provide a telecommunications backbone for educational service districts, the main campuses of public baccalaureate institutions, the branch campuses of public research institutions, and the main campuses of community colleges and technical colleges. Phase two contemplates connection to the system by several additional types of institutions, including local school districts and ". . . independent non-profit baccalaureate institutions. . . ." RCW 28D.02.070(2).
Given this background, and especially noting the language encouraging the participation of "independent non-profit baccalaureate institutions," you have asked several questions which we have rephrased for clarity as follows:
 1. Would the connection of private non-profit baccalaureate institutions to the K-20 network constitute an unconstitutional gift of public funds or lending of public credit to the private institutions, assuming that the private institutions would be charged for the costs of establishing and maintaining their connection to the system?
 2. Would it violate the state constitution to connect to the K-20 network an institution that has a religious affiliation, if the purpose of the connection is to expand the network's shared resources and not to promote religion or religious instruction?
 BRIEF ANSWER
We answer both of your questions in the negative. Where the creation of a statewide telecommunications agency is for a public purpose, and the connection of private institutions, including those with religious affiliations, is merely incidental to the public purposes of the network, and where the private institutions share in both the costs and benefits of the network, the participation of the private institutions violates neither the lending of credit nor the religious establishment provisions in the state constitution.
 ANALYSIS
Chapter 28D.02 RCW contemplates the establishment of a statewide telecommunications network connecting, eventually, all of the publicly-owned educational institutions in the state, including local school districts, community and technical colleges, and state-owned institutions of higher education. According to material you provided us in connection with your opinion request, the policy committee contemplates a wide range of telecommunications services to be provided through the "K-20 network." These would include, just as examples, internet and intranet facilities, video conferencing, long-distance teaching, and shared access to educational databases.
Although the legislation specifically contemplates the participation of private non-profit baccalaureate institutions in the K-20 network, and mentions them in several places in chapter 28D.02 RCW, it is clear from the context that providing benefit to the private institutions is not the major thrust of the legislation. While the purpose of including the private non-profit institutions in the network is not explicit in the legislation, you have explained in your opinion request that at least two major benefits would result. First, connecting the private institutions to the network would open their resources (which in some cases are not duplicated elsewhere) to the rest of the network, increasing both the volume and the variety of programs and services available through the network. Second, the inclusion of the privately-owned institutions increases the total size of the network and allows economies of scale in the purchasing and utilization of information infrastructure and services.
As your committee debates policy options on the development of the K-20 network, you have asked us to analyze two constitutional questions which might affect the committee's options.
Question 1. Would the connection of private non-profitbaccalaureate institutions to the K-20 network constitute anunconstitutional gift of public funds or lending of public creditto the private institutions, assuming that the privateinstitutions would be charged for the costs of establishing andmaintaining their connection to the system?
From the facts as you have supplied them and as chapter 28D.02 RCW sets legislative policy, the primary purpose of the K-20 network is to benefit students in the state's educational system, including elementary and secondary students as well as those in higher education institutions. The great majority of those students attend institutions owned and operated by the state and funded through tax revenue. As noted earlier, the purpose of inviting private non-profit institutions to join the network is primarily to gain for the state the benefit of the shared resources and services which the private institutions might provide.
Article VIII, section 5 of the state constitution provides that "[t]he credit of the state shall not, in any manner be given or loaned to, or in aid of, any individual, association, company or corporation." This provision has a parallel for local government in article VIII, section 7, and the two sections are read by the courts as equivalent. Tacoma v. Taxpayers of Tacoma, 108 Wn.2d 679, 743 P.2d 793 (1987) (footnote 13 in 108 Wn.2d at 701).
Although these provisions were at times interpreted quite literally by the courts, they have not been used for at least two decades to invalidate legislation which has an obvious public purpose and which only incidentally benefits private interests. This is especially true where the government in question receives payment or other bargained-for consideration from the private party involved.
Perhaps the most influential case in this regard is the Tacoma
case, in which the court upheld the city of Tacoma's scheme of conservation credits as authorized by state statute. The trial court had invalidated the program on a finding that any bargained-for consideration received by the city was insufficient because it was neither measurable nor lasting. The Supreme Court reversed, finding that, in the absence of donative intent, the court will invalidate a program only for a "grossly inadequate return." Tacoma v. Taxpayers of Tacoma, 108 Wn.2d at 703, citingAdams v. UW, 106 Wn.2d 312, 327, 722 P.2d 74 (1986).
In the very recent series of cases involving construction of a baseball stadium in King County using both state and county funds, the Court has adhered to this view of article VIII, sections 5 and 7. In both CLEAN v. State, 130 Wn.2d 782, 928 P.2d 1054 (1996) and in King County v. Taxpayers of King County, 132 Wn.2d 360,938 P.2d 309 (1997), the Court rejected challenges based on the "lending of credit" sections of the constitution, finding that there was a substantial public purpose in building the stadium and only an incidental, somewhat speculative, private benefit to the professional athletic team expected to lease and use the stadium. By almost any measure, the team had a more substantial interest in the construction and operation of the stadium than the private higher education institutions have in the development of the K-20 network.
Two more cases should be sufficient to illustrate the Court's willingness to permit considerable leeway in establishing public/private relationships which confer mutual benefit. In Wn.Natural Gas Co. v. Public Util. Dist. No. 1 of Snohomish Cy.,77 Wn.2d 94, 459 P.2d 633 (1969), the Court upheld a public utility district's practice of installing an electrical distribution system on the property of a private land developer, even though the developer was granted up to three years to reimburse the district for its costs. Examining the various elements of the contractual relationship between the district and developer, the Court found adequate consideration in the form of substantial benefits to the district.
Similarly, and perhaps even closer to the case you have posed, the Court found no lending of credit in Public Utility District No. 1of Snohomish Cy. v. Taxpayers of Snohomish Cy., 78 Wn.2d 724,479 P.2d 61 (1971). In that case, the Court upheld the authority of a group of municipal corporations to join with four privately-held companies in constructing and operating a coal-fired electric generation plant. Where the participation of the government entities served a public purpose, and provided a substantial public benefit, the court found no constitutional infirmity in a "joint venture" with private parties.
Given these precedents, we conclude that participation by one or more private non-profit institutions in the K-20 network would not violate article VIII, section 5, since there is no evidence of donative intent and the network will receive consideration from the private institutions. Any benefit to the private institutions will be purely incidental to the benefit derived by the public agencies in the network. We answer "no" to your first question.
Question 2. Would it violate the state constitution to connect tothe K-20 network (an institution that has a religiousaffiliation), if the purpose of the connection is to expand thenetwork's shared resources and not to promote religion orreligious instruction?
Your second question concerns two provisions of the state constitution regarding religious instruction and government. The more general of the two is article I, section 11, which contains the following sentence:
 . . . No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment: PROVIDED, HOWEVER, That this article shall not be so construed as to forbid the employment by the state of a chaplain for such of the state custodial, correctional, and mental institutions, or by a county's or public hospital district's hospital, health care facility, or hospice, as in the discretion of the legislature may seem justified. . . .
Const. art. I, § 11. (Emphasis added).
There is a related constitutional provision applying specifically to schools:
 All schools maintained or supported wholly or in part by the public funds shall be forever free from sectarian control or influence.
Const. art. IX, § 4.
Given this language, your second question raises the issue whether participation in the K-20 network by a religiously-affiliated institution would constitute an appropriation of public money or property for religious worship or instruction, or whether it would constitute the "support" of a religious establishment, or would result in "sectarian control or influence" over one or more schools maintained or supported by public funds.
As we understand the nature of the K-20 network, the mere connection of a religiously-affiliated institution with the net would not, in itself, constitute a violation of the constitution. The network is a communications system, somewhat analogous to such public services as a water system or a transportation system. Providing public service to religious institutions on the same basis as to others has never been held to be unlawful support.
Although the case law on religious establishment in Washington is strict, the programs struck down are all distinguishable from the K-20 network with its "mutual benefit" aspect. For instance, inState Higher Educ. Assistance Auth. v. Graham, 84 Wn.2d 813,529 P.2d 1051 (1974) and in Weiss v. Bruno, 82 Wn.2d 199, 509 P.2d 973
(1973), the State Supreme Court struck down programs aimed at benefitting students attending sectarian institutions, finding that they violated both article I, section 11, and article IX, section 4. In neither case was there any contractual or "mutual benefit" relationship between the private institutions involved and the government; the programs involved public fund "support" of private education. The same reasoning has been applied to furnishing bus transportation to pupils of sectarian schools.Visser v. Nooksack Valley Sch. Dist. No. 506, 33 Wn.2d 699,207 P.2d 198 (1949). Likewise, in the more recent case of Witters v.Comm'n For Blind, 112 Wn.2d 363, 771 P.2d 1119, cert. denied,493 U.S. 850, 110 S.Ct. 147, 107 L.Ed.2d 106 (1989), the question was whether use of vocational funds for an applicant to study a religious vocation was unconstitutional. Witters did not involve any contractual relationship between a government and a religious organization.
The courts have taken a different approach where religious institutions benefit only incidentally from a program designed for some broader public purpose. In Higher Educ. Facilities Auth. v.Gardner, 103 Wn.2d 838, 699 P.2d 1240 (1985), the Court upheld a program allowing the state to issue non-recourse bonds for capital projects to be constructed by non-profit institutions of higher education, including religiously affiliated institutions. The Court found that the tax-exempt status of the bonds benefitted the religious institutions but that this benefit was conferred by the federal income tax laws and resulted in no state "support" of the private institutions. See also Malyon v. Pierce County, 131 Wn.2d 779, P.2d, upholding Pierce County's chaplain program.
In AGO 1995 No. 3, we concluded that article I, section 11, and article IX, section 4 are not violated if a school maintains an "open public forum" and allows school property to be used by religiously oriented student groups on the same basis as non-religious non-curricular student organizations. We think the same reasoning applies here, where the K-20 network will be available to all the state's schools, religiously-affiliated or not.
Having concluded that the mere inclusion of religious institutions in the K-20 network would not violate the constitution, however, we add a note of caution: some uses of the network could still be unconstitutional. For instance, the case law indicates that use of the network, say, to facilitate religious instruction for public school students would be improper. We will not attempt here to anticipate all the possibilities that could arise, but those responsible for the network should remain sensitive to its status as a publicly owned resource and to the strictures of the constitution.
We trust this opinion will be of assistance to you.
Very truly yours,
CHRISTINE O. GREGOIRE Attorney General
JAMES K. PHARRIS Sr. Assistant Attorney General